## Richmond.

## CLARK v. COMMONWEALTH.

### DECEMBER 7th, 1893.

1. MANSLAUGHTER—*Self-defence—Case at bar.*—Upon the facts in this case as set out in the opinion of the court, *held*, there is no element of self-defence in it, and the verdict of guilty of manslaughter with five years' confinement in the penitentiary, will not be disturbed.

2. CRIMINAL PROCEEDINGS—*Jury from another county.*—Where a *venire facias* is directed to sheriff of another county to summon a jury, a list need not be furnished him. Code, § 4024.

3. IDEM—*Bill of exceptions.*—An entry in the order book that defendant excepted to a certain ruling of the trial court will not supply the place of a bill of exceptions.

4. IDEM—*Instructions.*—At the trial the court instructs that "if the jury, from the evidence, believe that prisoner wilfully inflicted upon deceased a wound calculated to endanger or destroy life, and that death ensued therefrom within a year and a day, the prisoner is none the less responsible for the result, although it may appear that the deceased might have recovered but for the aggravation of the wound by unskilful or improper treatment." HELD : No error.

5. IDEM—*Witnesses.*—Commonwealth need not call all the witnesses present at the homicide or named in the indictment. But the court, of its own volition, may call such witnesses for cross-examination by both sides, and they will not be considered as witnesses for either. *Hill's case,* 88 Va., 633.

6. MANSLAUGHTER—*Self-defence.*—Where death ensues on sudden provocation or quarrel, without malice aforethought, the killing is manslaughter. To reduce the offence to killing in self-defence the accused must prove two things, to wit: (1) That before the mortal blow was given he declined further combat, and retreated as far as he could with safety, and (2) that he killed the deceased through the necessity of preserving his life or to save himself from great bodily harm. *Vaiden's case,* 12 Gratt., 717.

Error to judgment of corporation court of city of Danville, rendered February 20, 1893, upon a verdict of the jury of guilty of manslaughter in the trial of an indictment against one J. T. Clark for the murder of J. R. Moffett, sentencing him to confinement for the period of five years in the State penitentiary. To this judgment the prisoner obtained a writ of error and *supersedeas.* Opinion states the case.

*Berkeley & Harrison, Peatross & Harris,* and *J. T. Harrison,* for prisoner.

*Attorney-General R. Taylor Scott* and *William R. Aylett,* for commonwealth.

LEWIS, P., delivered the opinion of the court.

1. The first point made in the petition for the writ of error, and insisted upon in the argument here, is that the jury that tried the prisoner was not a lawful jury.

One of the grounds of this objection is that, after an unsuccessful attempt had been made to obtain a jury in Danville the court ordered a *venire,* to be directed to the sergeant of Lynchburg, commanding him to summon twenty-four persons from that city, which was done, but that no list was furnished of the names of persons to be summoned. It is contended that such a list ought to have been furnished, and the same point was made before the jury was sworn. The trial court, however, overruled the objection, and in this there was no error. Authority to direct jurors in a felony case to be summoned from another county or corporation than that in which the trial is to be had, is conferred by section 4024 of the Code, and there is no requirement that a list in such a case shall be furnished. Sections 4018 and 4019 apply only to the summoning of jurors from the county or corporation in which the trial is to be had; and the reason, no doubt, of the dif-

ference between those sections and section 4024, in respect to furnishing a list, is that in the former case the court or judge is presumed to have the means and information essential to intelligent action in the matter, but not so in the latter case. At all events, there is nothing in the statute to support the prisoner's contention, and we cannot, without assuming legislative authority, interpolate into the statute a requirement which the legislature has not seen fit to insert in it.

Objection is also made to the exclusion from the panel of Hirsh and Vernon after they had been sworn on their *voir dire* and accepted as qualified jurors. As to this matter, the transcript recites that after Hirsh and Vernon had been thus accepted, the attorney for the commonwealth moved to be allowed to re-examine them on oath as to their fitness to serve as jurors, and to introduce witnesses to prove that Vernon had on one or more occasions, after the death of the deceased, said the prisoner ought not to be convicted of the murder charged; "*which being done,*" it is further recited, "they were excluded from the panel, to which action of the court the prisoner, by counsel, excepted." No formal bill of exceptions, however, was tendered or signed, and the unauthorized entry by the clerk on the minutes or order book that the prisoner excepted, although the orders were signed, cannot supply the place of a bill of exceptions. Exceptions, to be of any avail, must not only be so drawn up as to distinctly present the ruling objected to, but they must be signed by the judge; and unless so authenticated they are no part of the record of the case. Code, sec. 3385; *Young* v. *Martin*, 8 Wall., 354; *Roanoke Land and Imp. Co.* v. *Karn & Hickson*, 80 Va., 589; *Fry* v. *Leslie*, 87 *Id.*, 269; *Trumbo's Adm'r* v. *City Street Car Co.*, 89 *Id.*, 780.

The point, therefore, is not presented by the record proper, and hence cannot be considered here. It is not improper, however, to say that were it regularly presented, we would have no hesitation in holding it to be without merit.

2. The next assignment of error is that the court misdi-

rected the jury. No reasons, however, are urged in support of this assignment; and it was virtually conceded in the argument at the bar that the action of the court in regard to the instructions was without error, as it unquestionably was.

The ninth instruction given for the commonwealth, and the only one we deem it necessary to specially mention or consider, is as follows:

"If the jury believe from the evidence that the prisoner wilfully inflicted upon the deceased a dangerous wound, one that was calculated to endanger and destroy life, and that death ensued therefrom within a year and a day, the prisoner is none the less responsible for the result, although it may appear that the deceased might have recovered but for the aggravation of the wound by unskilful or improper treatment."

The prisoner shot the deceased in the abdomen, with a pistol, on the street in Danville, inflicting, according to the evidence for the commonwealth, a wound from which death ensued within less than thirty-six hours. An attempt was made on behalf of the prisoner to show that death was caused by improper surgical treatment; and it was to meet the evidence on this point that the instruction just quoted was given.

In *Commonwealth* v. *M'Pike*, 3 Cush., 181, it was laid down that where a surgical operation is performed in a proper manner, and under circumstances which render it necessary, in the opinion of competent surgeons, upon one who has received a wound apparently mortal, and such operation is ineffectual to afford relief and save the life of the patient, or is itself the immediate cause of death, the party inflicting the wound will, nevertheless, be responsible for the consequences; and such is the settled law.

Lord Hale says: "If a man give another a stroke, which it may be is not in itself so mortal but that with good care he might be cured, yet if he die of the wound within the year and day, it is homicide or murder, as the case is, and so it hath been always ruled. * * * If a man

receives a wound, which is not in itself mortal, but either
for want of helpful applications, or neglect thereof, it turns to
a gangrene, or a fever, and that gangrene or fever be the imme-
diate cause of his death, yet this is murder or manslaughter in
him that gave the stroke or wound; for that wound, though
it were not the immediate cause of his death, yet, if it were the
mediate cause thereof, and the fever or gangrene was the im-
mediate cause of his death, yet the wound was the cause of the
gangrene or fever, and so consequently is *causa causans.*" 1
Hale, P. C., 428.

To the same effect is *Commonwealth* v. *Hackett*, 2 Allen
(Mass.), 136, where, after a review of the authorities, the
court, speaking by Chief Justice Bigelow, declared the rule to
be that if the wound was a dangerous wound, that is, calcu-
lated to endanger or destroy life, and death ensued therefrom,
it is sufficient proof of the offence of murder or manslaughter,
as the case may be, and that the person who inflicted it is re-
sponsible, though it may appear that the deceased might have
recovered if he had taken proper care of himself, or submitted
to a surgical operation, or that unskilful or improper treatment
aggravated the wound and contributed to the death, or that
death was immediately caused by a surgical operation rendered
necessary by the condition of the wound. "A different doc-
trine," it was added, "would tend to give immunity to crime,
and to take away from human life a salutary and essential
safeguard." See, also, *Commonwealth* v. *Green*, 1 Ashm., 289;
*State* v. *Bentley*, 44 Conn., 537; S. C., 26 Am. Rep., 486; *State*
v. *Morphy*, 33 Iowa, 270; S. C., 23 Am. Rep., 122.

In the case in 44 Conn. the deceased was shot in the arm,
and died eleven days thereafter of lockjaw. The prosecu-
tion claimed that death resulted from the wound; the accused
that it resulted from the treatment of the case by the attend-
ing physicians. The wound was dressed in the first instance
by one surgeon, and afterwards to the time of death by
another. These differed radically as to the manner in which

the case should have been treated. The accused was convicted of manslaughter, and the conviction was held good. "There is no such defect in the law," it was said, "as that the person who intentionally inflicts a wound calculated to destroy life, and from which death ensues, can throw responsibility for the act upon either the carelessness or the ignorance of his victim, or shield himself behind the doubt which disagreeing doctors may raise as to the treatment proper for the case."

In conformity with these authorities, Greenleaf lays it down that "if death ensues from a wound given in malice, but not in its nature moral, but which, being neglected or mismanaged, the party died, this will not excuse the prisoner who gave it, but he will be held guilty of the murder, unless he can make it clearly and certainly appear that the maltreatment of the wound, or the medicine administered to the patient, or his own misconduct, and not the wound itself, was the sole cause of his death; for if the wound had not been given the party had not died." 3 Greenl. Ev., sec. 139.

3. The law, then, having been correctly propounded to the jury, the remaining question is, whether the verdict was warranted by the evidence, upon which question, it is important to observe, the prisoner occupies in this court the unfavorable position of a demurrant to evidence, the evidence, not the facts, being certified. That is to say, he must be considered as admitting the truth of the commonwealth's evidence and all just inferences which the jury could have properly drawn therefrom, and as waiving all his own evidence in conflict therewith, and all inferences from his own evidence which do not necessarily result therefrom; and unless, when viewed in this light, the verdict be plainly wrong, it is our duty to affirm it. Code, sec. 3484, Acts 1891–'92, p. 962; *Read's Case*, 22 Gratt., 924; *Gravely's Case*, 86 Va., 396; *Gaines' Case*, 88 *Id.*, 682.

The evidence in the case is voluminous, but its salient points may be briefly stated. The deceased was a Baptist preacher

and an ardent Prohibitionist. He was also the editor of a paper called "Anti-Liquor." The prisoner was a lawyer and an ardent Democrat. Both were men in the prime of life. During the progress of the presidential election, on the 8th of November, 1892, both were actively engaged at the polls, when the prisoner accused the deceased of attempting to perpetrate a fraud by having bogus Democratic tickets printed. At this the deceased struck the prisoner a blow, and both were afterwards fined. Two days thereafter the deceased published a card in his paper relative to the disturbance on election day, in which he spoke of the prisoner as a "contemptible whiskeyite," and also as "a one-horse lawyer" who had been doing the dirty work of the liquorites for two years, and who, during a wet and dry campaign, had proposed to the liquor men "to buy a lot, and settle a nigger on it, next to Mr. Moffett," the deceased.

The prisoner was absent from Danville at the time of this publication, and did not return until the evening of the next day, when he was informed of it. The day before the publication, however (*i. e.*, the day or the evening after the election), in conversation with several gentlemen on the street relative to his difficulty with the deceased, he declared his purpose to "get even with him," and that they both could not live in the same town twenty-four hours longer; and within less than three hours before the shooting, he declared, in the presence of several witnesses, who testified for the commonwealth, that the deceased would have to leave town, and that the quicker he left the better it would be for him.

It appears that just before the shooting, and soon after being informed of the above mentioned publication, the prisoner went into the office of the Danville *Register* in search of a copy of the paper. When he reached the office, observing the deceased in conversation, standing with his back to the door, he turned and went out. This was between 8:30 and 9 o'clock in the evening. Upon coming out of the Register building he

walked up the street, and in a little while the deceased came out and walked up the same street. In a few minutes they met, when the prisoner shot and mortally wounded the deceased. The latter, in his dying declaration, said: "I left the *Register* office and walked up Main street. I met a man approaching me. He seemed to be coming straight, so I stepped aside to give him room. He was four or five yards from me when he commenced firing on me. I endeavored to secure his weapon, but was not successful in doing so until Mr. Green Williams, chief of police, came up and separated us." His assailant, he said, was the prisoner, though he did not recognize him until he commenced firing; and in answer to questions he further stated that he had no pistol, and that he made no assault on the prisoner before the firing commenced.

There were four shots fired, and upon examination of the prisoner's pistol, after the parties were separated, four of its five chambers were found to be empty. The fifth contained a loaded shell. The prisoner was shot in the wrist, and he declared the deceased had shot him. This the deceased denied. He also denied that he had a pistol, and requested the officer to search him, which the officer then and there did, without finding any. The prisoner, it seems, had been in the habit of carrying a pistol for a number of years.

Now, if this evidence stood alone, the jury would have been warranted in finding the prisoner guilty of murder. But there was evidence tending to show that the parties were engaged in a mutual combat before any of the shots were fired; and the jury were no doubt influenced by this evidence in finding the prisoner guilty of manslaughter only. The testimony of two of the witnesses, viz: Green Williams, the officer just mentioned, and one Gravely, is very positive on this point. Both claim to have been eye witnesses of the shooting, and the name of Williams was among those at the foot of the indictment. Accordingly, at the trial, the prisoner moved that these witnesses be called for the prosecution, but the court

refused to grant the motion. It did, however, put them on the stand, with liberty to both sides to cross-examine them, which was done; and it is now contended for the prisoner that their testimony is commonwealth's evidence, but this position is untenable.

According to *Hill's Case*, 88 Va., 633, the prosecution is not bound to call all or any of the witnesses present at the transaction in cases of homicide, as in England, but it is for the representative of the commonwealth to say what witnesses he will call; and this discretion ought not to be interfered with. The trial judge, however, may, in his discretion, call any witness who was present at the transaction, or whose name is on the indictment, for cross-examination by both sides; but, as was said in *Hill's Case*, a witness so called is not the witness of either party. Consequently, when the case is brought to the appellate court on a certificate of evidence, the evidence of such a witness, so far as it conflicts with the commonwealth's evidence, is not to be considered, since the accused, in such a case, according to the rule of a demurrer to evidence, admits the truth of the commonwealth's evidence, and all reasonable inferences that the jury could have drawn therefrom.

The point, however, is not a very material one in the present case, because the jury found the accused guilty of manslaughter; and if we were to consider all the evidence in the record, the result would be the same.

It is a principle of criminal law that where death ensues on a sudden provocation, or sudden quarrel, without malice prepense, the killing is manslaughter, and in order to reduce the offence to killing in self-defence, the accused must prove two things, viz: (1.) That before the mortal blow was given, he declined further combat, and retreated as far as he could with safety; and (2) that he killed the deceased through the necessity of preserving his own life, or that there was reasonable ground to believe that the killing was necessary to pre-

serve his own life, or to save himself from great bodily harm; which has not been shown in the present case.

In *Vaiden's Case*, 12 Gratt., 717, it was held that to make out a case of self-defence in a case of homicide, the accused must show to the jury that the defence was necessary to protect his own life, or to protect himself against grevious bodily harm; and that with regard to the necessity that will justify the slaying of another in self-defence, the accused must not have wrongfully occasioned the necessity, for a man shall not in any case justify the killing of another by a pretense of necessity, unless he were without fault in bringing that necessity upon himself. See, also, *Bristow's Case*, 15 Gratt., 634; *Lewis' Case*, 78 Va., 732; *Honesty's Case*, 18 *Id.*, 283, 298; *Brown's Case*, 86 *Id.*, 466, 470; *Gaines' Case*, 88 *Id.*, 682, 693.

The prisoner in the present case was examined as a witness, and testified that when he met the deceased, the latter caught him by the coat and pushed him back several steps, at the same time drawing a pistol from his hip pocket; that he (the prisoner) knocked his hand down, and then drew his own pistol and fired. But the statement that the deceased had a pistol is positively disproven. He denied it in his dying declaration, as he had previously done, in the presence of the prisoner, immediately after the shooting; and when, at his request, he was searched by the police officer, no pistol was to be found. It is clear from the record that he had no pistol, and that the prisoner's statement on the subject was fabricated. In short, there is no element of self-defence in the case; and the judgment must be affirmed.

JUDGMENT AFFIRMED.