[Civ. No. 19260. First Dist., Div. One. Dec. 3, 1962.]

WAYNE TRAVIS, Plaintiff and Appellant, v. SOUTHERN PACIFIC COMPANY, Defendant and Respondent.

Belli, Ashe & Gerry, Lou Ashe and Robert H. Miller for Plaintiff and Appellant.

Bledsoe, Smith, Cathcart, Johnson & Phelps and Robert A. Seligson for Defendant and Respondent.

BRAY, P. J.—In an action for damages for personal injuries incurred in a collision between an automobile and a railroad train, plaintiff appeals from a judgment on jury verdict in favor of defendant.

### QUESTIONS PRESENTED

1. Was the cross-examination of plaintiff's son, driver of the car, and the cross-examination of plaintiff concerning alleged traffic violations of the son, improper?

2. Was there error in requiring the witness Villicano to testify?

3. (a) Was imputed negligence an issue in the case?
 (b) Was instruction thereon proper?

4. Did the court err in giving or refusing certain other instructions?

5. Alleged misconduct of the trial judge.

6. Alleged misconduct of defendant's attorney.

### EVIDENCE

Plaintiff frankly concedes that the evidence was sufficient to support the verdict, but contends that it was in such direct conflict that the case was a close one, and that therefore any error as claimed by plaintiff could have swung the balance in favor of defendant.

Plaintiff Wayne is a school teacher about 45 years of age. Between the hours of 5:30 and 6:20 p. m. he was riding in an automobile being driven by his son Clarence, 20 years of

age. The automobile was registered in the names of Clarence and plaintiff. It was still daylight. They were traveling in an easterly direction on Lone Tree Way near Brentwood, Contra Costa County, and near its intersection with the railroad tracks of defendant Southern Pacific Company. On the southerly side of Lone Tree Way (the right side as plaintiff's car was proceeding) the view of the railroad tracks is obscured by an orchard until a point 100 feet westward from the tracks. Westerly from and parallel with the tracks is Fairview Avenue. The crossing is protected by a cross-buck railroad sign at the southwest corner of the intersection and an electric wigwag signal on the northeast corner which, when operating, swings from side to side and at the same time displays a red light and sounds a bell. The applicable speed law at this section of Lone Tree Way under the then prima facie speed law was 55 miles per hour. The allowable speed for the train at the crossing was 79 miles per hour. The evidence indicated that the train was going 75 miles per hour.

Clarence testified that as he approached the crossing he knew he would have to cross the railroad tracks, as he was familiar with the crossing. About a quarter of a mile from the crossing his father told him to ''watch the tracks, they are rough.'' He observed the wigwag signal for the last quarter of a mile to the tracks. It did not operate. He did not hear the approach of the train nor hear any bell. He became aware of a car stopped in the middle of the highway on the opposite side of the tracks. He was then going about 45 miles per hour. He checked the wigwag again. It was not working. When about 120 feet from the tracks he heard the train's whistle. The train entered the crossing traveling northward about 75 miles per hour. Clarence then saw the train and immediately applied his brakes, laying down about 63 feet of skid marks. He was unable to stop and he collided with the train. (The evidence showed he hit the train between the second and third diesel units of the train.) The car was dragged and spun around. Clarence claimed that the orchard obstructed his view and he did not see the train until it came out from behind the orchard. Plaintiff Wayne was badly injured. Among other injuries, both legs required amputation below the knees.

Neither the engineer nor the fireman saw the car, and none of the train crew knew there had been a collision until they arrived at Martinez, where they were informed of the accident.

There were a number of witnesses who testified that the wigwag was working, the engine whistle blew and the bell on

the signal rang. There were no witnesses other than Clarence and plaintiff who testified that none of these things happened. However, there were three witnesses who testified that on another occasion the signals had not worked when a train approached the crossing. There were witnesses rebutting the testimony of a particular witness on these subjects, and witnesses to rebut the rebutting witnesses.

We will discuss the evidence concerning the claimed negligence of Clarence and the claimed contributory negligence of plaintiff later.

1. *Traffic Violations.*

Clarence testified that about a quarter of a mile from the crossing he slowed the car from 50 to 45 miles per hour, which was his speed when 120 feet from the crossing when he first saw the train. He then applied his brakes. Plaintiff's testimony as to Clarence's speed was practically the same as that of Clarence. California Highway Patrol Officer Taylor testified that there were 63 feet of skid marks from plaintiff's car. They started to curve approximately 10 feet from the nearest rail and broke off just short of the tracks. Walter Patrick testified that about a quarter of a mile west of the crossing he had run out of gas and was walking toward the crossing and was about 200 feet therefrom when he heard the wigwag bell ringing and saw the signal start swinging back and forth. The signal continued working and the bell ringing to and including the accident. When he was about 100 feet from the crossing he saw the train about 250 feet therefrom, going about 70 to 75 miles per hour. The train whistle was blowing continuously at short intervals. He walked about 8 to 10 steps when the Travis car whizzed by going at a speed of 60 to 70 miles an hour. The train whistle was still blowing as the train went through the crossing. He heard the crash and saw that the train had spun the car in and over on the left side of the road. Part of the train was still going across the crossing. Patrick was the only witness, other than Lydia Gonzales, who saw the car prior to and at the time of the collision. Lydia said that she saw the car when it was one or two car lengths from the crossing.

It is apparent from the foregoing recital that the question of the speed of the Travis car was an important element at the trial. Clarence on direct examination in answering a question asked by plaintiff's counsel as to his speed in the area of the Lone Tree School (near the crossing) volunteered that he was

"always conscious of speed laws." On cross-examination the following occurred: "Q. Now, you said in your direct examination that you checked your speedometer because you were always what, very, you said, careful about your speed? A. Yes. Q. And was there any special reason for your being careful about your speed? A. No, not particularly; it was just a habit. Q. Since you had been in California before this accident you stated it had been your habit to watch your speed and keep within the speed limit? A. Yes, sir." Then the cross-examiner asked him if since he had been in California up to the time of the accident (a period of about six months) he had received four or five speeding tickets. An objection to this question was sustained. Counsel and court then moved to chambers and discussed the admissibility of this type of evidence. On return into court and over plaintiff's objections, the court permitted defendant to bring out from Clarence the fact that prior to the accident and within a six months' period he had been arrested for speeding four times.

■ There can be no question but that as a general rule evidence of prior traffic citations is not admissible to prove that on the particular occasion in question the driver receiving such prior citations was negligent. Defendant concedes this. (See *Shmatovich* v. *New Sonoma Creamery* (1960) 187 Cal. App.2d 342 [9 Cal.Rptr. 630]; also 20 A.L.R.2d 1212.) But, it contends, and the trial judge believed, that the evidence was admissible here in impeachment of Clarence's volunteered statement that he was always conscious of the speed laws. If Clarence's statement is of the type which may be impeached, then the cross-examination was proper and the evidence of his prior citations admissible. ■ The line between statements volunteered by a witness which may be impeached and those which may not be impeached is sometimes difficult to draw. Mainly it is a question of the materiality of the subject mentioned, primarily determined by whether the matter would be admissible independently of impeachment. ■ As we said in *People* v. *Heckford* (1957) 149 Cal.App.2d 250, 255 [308 P.2d 497] : " ' ". . . Legitimate cross-examination does not extend to matters improperly admitted on direct examination. Failure to object to improper questions on direct examination may not be taken advantage of on cross-examination to elicit immaterial or irrelevant testimony." (*People* v. *Mc-Daniel* (1943) 59 Cal.App.2d 672, 677 [140 P.2d 88].)

■ Neither is it within the proper scope of impeachment to show that a witness has given false testimony as to a matter

which could not be proved independently in the case.' (*People* v. *Wells,* 33 Cal.2d 330, 340 [202 P.2d 53].)'' However, the rule that impeachment will not lie where the subject could not be introduced independently is not absolute. For example, in criminal cases it is well settled that where a defendant volunteers that he never had committed such an offense as the one charged, evidence of prior offenses is admissible to impeach his statement. In *People* v. *Lindsey* (1949) 90 Cal.App.2d 558 [203 P.2d 572], the court said (p. 566) : ''The propriety of rebuttal evidence is determined by the doctrine of fair play. The accused may not overemphasize his claims of utter innocency by saying that he *never at any time* committed an offense of the kind on trial, or never met his accuser or an adversary witness in his lifetime and claim that he has thereby disproved the accusation and overwhelmed his contradictory witnesses. Having chosen to extend the scope of the inquiry by a resort to superlatives, the accused must expect to be met with contrary proof. The prosecution will not be precluded from 'showing out of the defendant's own mouth that such statement is false' [citation] and with equal justice his testimony may be rebutted by witnesses who deny what he has said in his attempt to impress the sincerity of his plea by his use of extravagant language. [Citation.]'' (See also *People* v. *Sylvia* (1960) 54 Cal.2d 115 [4 Cal.Rptr. 509, 351 P.2d 781] ; *Chronicle Pub. Co.* v. *Superior Court* (1960) 54 Cal.2d 548, 560 [7 Cal.Rptr. 109, 354 P.2d 637] ; *People* v. *Westek* (1948) 31 Cal.2d 469 [190 P.2d 9] ; *People* v. *Staggs* (1960) 180 Cal.App.2d 578 [4 Cal. Rptr. 587].)

In *Barshfield* v. *Vucklich* (1921) 108 Kan. 761 [197 P. 205], the court stated : ''Another objection is that the court permitted inquiry as to other acts of careless driving and of accidents resulting from it. This testimony was drawn out in the cross-examination of the defendant. He had testified that he was a careful driver and was driving carefully at the time of the accident. He was then asked if he had not been stopped and reprimanded by officers for fast driving, if he had not run into a light pole, if he had not struck a boy, and had not been arrested for careless driving. To some of these inquiries he gave an affirmative answer and to others he entered a denial. On the direct examination no evidence was offered as to his driving habits or of careless driving on other occasions. The general rule is that acts of negligence on other occasions than the one in question are, with a few exceptions, inadmissible.

[Citation.] Here, however, it was only a cross-examination of the defendant himself as to his claim of careful driving, and no reason is seen why such an inquiry may not be permitted within reasonable limitations." (197 P. at pp. 206-207.)

In *People* v. *Downs* (1952) 114 Cal.App.2d 758, 762 [251 P.2d 369], the court held that the defendant had "opened the door to any competent evidence calculated to disprove his sweeping assertion of reform."

In *People* v. *Westek, supra,* 31 Cal.2d 469, the court distinguished the impeachment allowed there from that denied in *People* v. *McDaniel* (1943) 59 Cal.App.2d 672 [140 P.2d 88], cited by plaintiff, and said (p. 479) : "But here appellant's voluntary declaration of his good character and unimpeachable moral status in relation to his prior conduct with boys was material to the issue involved, and the prosecution had the right to present responsive evidence which would 'tend to contradict' appellant's self-serving statement 'or weaken or modify its effect.' [Citation.]"

In our case, as pointed out hereinbefore, on the issue of whether the accident was solely caused by the son's negligence, or whether it was caused by a combination of the son's negligence and that of defendant, with evidence from which, as will hereafter be shown, any negligence of Clarence could be imputed to plaintiff, speed was such a vital issue, that Clarence's attempt to bolster up his own testimony made the question of his impeachment a matter material in the trial. Therefore, the evidence concerning his receiving the traffic citations was relevant and material.

On cross-examination of plaintiff, he was permitted to be asked, over objection, if he was aware at the time of the accident that his son had been arrested four times for speeding around the Brentwood area. Plaintiff admitted this knowledge. He was then asked if Clarence had followed the same pattern of being arrested in Oklahoma for speeding. Objection was made and in the ensuing discussion between counsel the court did not rule nor did the witness answer the question. Finally, plaintiff was asked without objection if he knew that Clarence had been arrested in southern California shortly before the accident for passing 13 automobiles at an excessive speed and cutting in and being on the wrong side of the highway. Plaintiff answered that he did not know the details but that Clarence had said something about getting a ticket in southern California. Objection to a question concerning Clarence getting tickets after the accident was sustained.

Plaintiff when asked if, knowing of the speeding tickets Clarence had received, he didn't caution Clarence as to his driving, stated that when plaintiff rode with Clarence the latter's driving always suited plaintiff.

This evidence, under the circumstances, was admissible on the question of plaintiff's contributory negligence. It was a question for the jury, whether plaintiff's knowledge of Clarence's speeding characteristics required plaintiff as a reasonable man to be observant of the manner in which Clarence was approaching the railroad tracks which plaintiff knew were there.

2. *The Witness Salvadore Villicano.*

A most unusual situation arose in connection with this witness, who had stopped his car at the intersection because of the approaching train. His sister-in-law, Lydia Gonzales, testified that accompanied by her sister Alice she was riding in Salvadore's car, which he was driving, on Lone Tree Way approaching the crossing from the east (the opposite way from which the Travis car was approaching). As they neared the crossing a train was coming from their left. They stopped about a car length away from the wigwag signal. (This was the car that Clarence said he saw stopped near the crossing.) She did not hear any bell ringing and did not see the wigwag operating. She did not hear any whistle. The three of them were talking, and she wasn't paying any attention to whether there were wigwags or bells, and things were a little hazy in her mind. She didn't see the wigwag and doesn't know whether or not it was working. While her car was still moving toward the crossing she saw the Travis car about one or two car lengths from the crossing. She thought it was going to turn into Fairview Avenue. In a statement taken two days after the accident she stated that she did not see the Travis car at any time before the train went by.

On the evening of the accident Salvadore gave a statement to Officer Taylor that he saw the wigwag operating at the time of the accident. Taylor made a note of this statement in his report. The day after the accident Salvadore gave a statement to defendant's investigators to the effect that he didn't know whether the whistle blew or the wigwag was operating. Three days after the accident he gave a statement to plaintiff's investigators in which he said that the whistle may have been blowing and the signal working but that he didn't notice them.

Plaintiff subpoenaed Salvadore. After two days' attendance

at the trial, plaintiff dismissed him. Defendant in chambers then requested the court to call Salvadore as the court's witness to give both parties the opportunity to cross-examine him. Considerable discussion between court and counsel then ensued, it which it appeared that neither party trusted the witness or wanted to be bound by his testimony. Finally the court over plaintiff's objection permitted defendant to call the witness, with the understanding that either party could cross-examine him. The court stated that Salvadore was "an important witness . . . He is one of the key witnesses. He was sitting right there"; and later, ". . . I am not going to let a witness play fast and loose. . . . [H]e knows more about it than anyone else. In the interests of justice he should be brought in. . . . The Court has a very wide latitude, knowing the circumstances. . . . I don't know what he is going to say. On the background of it, I will let either side go into the facts with him."

Defendant had Salvadore's statement made to its investigator and knew of his statement to plaintiff's investigator and that both statements were contradictory to his statement to Officer Taylor; so there would have been nothing surprising if Salvadore on the stand were to testify contradictory to what was said in the Taylor statement. When Salvadore was on the stand he denied talking to Taylor other than giving his name. This, of course, surprised defendant (and probably plaintiff also). Undoubtedly defendant considered that Salvadore might deny making the statements that Officer Taylor said he made, but did not expect him to deny talking to Taylor at all. It is obvious that a traffic officer investigating an accident at the scene is going to ask an eyewitness something more than his name.

The effect of the court's allowing the witness to be placed upon the stand by defendant but subject to cross-examination by both parties, was, in effect, the equivalent of the court's calling him to the stand. It therefore becomes necessary to consider the court's power in this respect.

In *Roth* v. *Moeller* (1921) 185 Cal. 415, 420 [197 P. 62], the court stated: ". . . it is within the power of the court to call or examine witnesses in furtherance of justice against the will of either party." There the court had put certain questions to the plaintiff, while appearing as a witness in his own behalf, which resulted in the disclosure of facts material to the defense and which the plaintiff contended prejudiced his case. In *Marin Water etc. Co.* v. *Railroad Com.*

(1916) 171 Cal. 706, 714 [154 P. 864, Ann.Cas. 1917C 114], the court held that "judicial tribunals" have the power in the interests of justice to call witnesses against the will of either party.

In *Clark* v. *Commonwealth* (1893) 90 Va. 360 [18 S.E. 440], in a murder trial, the defendant moved that two of the eyewitnesses to the shooting be called for the prosecution. The court refused to grant the motion but did put them on the stand with liberty to both sides to cross-examine them. On appeal the defendant contended that their testimony was "commonwealth's evidence." (P. 443 [18 S.E.].) The reviewing court held, "The trial judge, however, may in his discretion, call any witness who was present at the transaction . . . for cross-examination by both sides; but as was said in *Hill's Case* [88 Va. 633 (14 S.E. 330)], a witness so called is not the witness of either party." (P. 443 [18 S.E.].)

We are frank to say that we have been cited to no case, nor has our independent research disclosed any case, dealing with a civil action in which a witness has been called to the stand by the court, over objection of a party. However, we can see no difference in this respect between a civil and a criminal case. In both, the endeavor of the court and the parties should be to get at the truth of the matter in contest.

Fundamentally, there is no reason why the court in the interests of justice should not call to the stand anyone who appears to have relevant, competent and material information.

In our case, Salvadore was in a unique position to know the situation at the crossing at the time of the accident. He had stopped his car to let the train go by. He was facing the signal system for an appreciable length of time. Surely, if anyone would know whether the wigwag was working, he would know. Moreover, while Salvadore had made conflicting statements, they were not made under oath. The court had a right to assume that when required to testify under oath, Salvadore would tell the truth. So in the interests of justice it was the right of the court, if not its duty, to put him on the stand to see if he would testify as to the situation. The court's ruling that neither party would be bound by the witness' testimony and that both parties should have the right to cross-examine him was an eminently fair one. (See Wigmore on Evidence, 3d ed., vol. IX, pp. 268-270.) In all lawsuits the interests of justice should be paramount, and while the calling of a witness by the court is apparently an unusual

procedure, that fact should not tie the hands of a judge who feels that it is in the interests of justice that an attempt be made to get at the truth of the matter involved. As was said in *Chronicle Pub. Co.* v. *Superior Court, supra,* 54 Cal.2d 548, the modern trial is " '. . . less a game of blindman's buff and more a fair contest with the basic issues and facts disclosed to the fullest practicable extent. . . .' " (P. 572.) ▇ The fact that Salvadore had given contradictory statements not under oath on the subject was not enough in itself to deprive the court of the right to require him, for the first time under oath, to testify as to what he observed. While it would have been better for the court to call Salvadore as its witness, it was not an abuse of discretion to allow defendant to call him, with the understanding that both parties had the right to cross-examine him. Salvadore testified that when his car in which his wife, his sister-in-law and he were riding, stopped at the crossing, the train was "way down the road. I don't know how far." He didn't look at the wigwag and didn't know whether he heard the train whistle. He then denied making any statement to the highway patrol officer who arrived at the scene shortly after the accident. He contended that the officer asked him no questions other than what his name was, although at one place in his testimony, when asked by the court if he had said anything to the officer, he said, "Well, the officer came and asked, well, about the accident there. I told him that the train was coming and I was stopped there and as soon as the train passed, I didn't even notice whether the train blew the whistle or the wigwag was going or anything." He then stated that he had not said that to the officer, and repeated that all the officer asked him was his name. He admitted signing a statement for a Southern Pacific investigator in which he said he could not say one way or the other concerning the sounding of the train's whistle or bell, nor whether the wigwag signal was working as he did not look to see. He likewise admitted signing a statement for a plaintiff's investigator in which he stated that the train's whistle might have been blowing and the signal working but he did not notice them. He did not remember whether he told the railroad's investigator, when the latter called his attention to the statement that the police officer took, that he didn't want to talk about the wigwag so that he would not get involved.

Unfortunately, Salvadore's testimony added nothing to the evidence in the case. However, that fact, which could only be determined after he testified, did not cause the court's action

in permitting him to be called for cross-examination to constitute an abuse of discretion. (See 13 Cal.L.Rev. 296.)

So far as the jury was concerned, it not having heard the discussions in chambers concerning Salvadore, he was a defendant's witness, even though it appeared that he had been subpoenaed by plaintiff. ▮▮▮▮ When, testifying for the first time under oath, he denied talking to the officer, other than giving his name, undoubtedly all the participants in the case were surprised. (The judge apparently was, for he then called the witness' attention to the fact that he was under oath.) It then became necessary in fairness for defendant to impeach him. " [T]here are cases that permit impeachment not because the trial testimony was detrimental, but because of the psychological loss of position before a jury caused by a disappointing witness." (*People* v. *Spinosa* (1953) 115 Cal.App.2d 659, 667 [252 P.2d 409].)

The court was very careful to instruct that Officer Taylor's testimony concerning Salvadore's statements to him could be used only for impeachment of Salvadore and not for proving the truth of the statements.

3.　(a)　*Imputed Negligence an Issue.*

As will hereafter appear, the court instructed that by reason of plaintiff being one of the registered owners of the car, any negligence of Clarence would be imputable to plaintiff. Plaintiff contends that there was no allegation of imputed negligence in the pleadings and that because of defendant's failure to plead it, it could not be an issue, and hence instructing on it was prejudicial error. Defendant's only affirmative defense pleaded was that plaintiff was himself careless and negligent and that such carelessness and negligence proximately contributed to the happening of the accident. Defendant did not plead negligence of the driver Clarence or the imputation of his negligence to plaintiff.

▮▮▮▮ It is well settled that imputed negligence must be specifically pleaded and that the general plea of contributory negligence does not constitute a plea of imputed negligence. (See *Carroll* v. *Beavers* (1954) 126 Cal.App.2d 828, 834 [273 P.2d 56] ; *Bencich* v. *Market St. Ry. Co.* (1937) 20 Cal.App.2d 518, 526 [67 P.2d 398] ; 2 Witkin, Cal. Procedure, § 538, subd. 3, p. 1536.)

Defendant contends, however, that although the defense was not pleaded it was an issue throughout the case and particularly throughout the trial, and that the rule set forth in

*Vaughn* v. *Jonas* (1948) 31 Cal.2d 586, 605 [191 P.2d 432], applies, to wit, "The evidence hereinabove reviewed is consistent with the view that the case was tried on the theory that malice was at issue and that punitive damages were claimed. A party cannot permit an issue to be litigated and on appeal escape the consequences by claiming that such issue was not pleaded. [Citations.]" (See also *Cockerell* v. *Title Ins. & Trust Co.* (1954) 42 Cal.2d 284, 288 [267 P.2d 16].)

 It therefore becomes necessary to study the record to determine whether Clarence's negligence and its imputability actually was tried out. Defendant in its pretrial statement stated that it alleged contributory negligence of plaintiff and that it contended that the sole proximate cause of the accident was Clarence's negligence. The pretrial conference order did not refer to this fact other than to state, "The defendant contends, *among other things,* that the signals were operating." (Emphasis added.) In his opening statement to the jury before the taking of testimony began, plaintiff's counsel stated that he would show that Clarence at all times was acting in his driving as a reasonably prudent person would do, thus placing in issue the question of Clarence's negligence. Counsel further stated that he would prove that in spite of the registration certificate plaintiff had no legal ownership in the car. This matter would be of no importance (particularly as both Clarence and plaintiff in their depositions had made no mention of the joint registration, both stating that Clarence was the registered owner) except on the question of imputation to plaintiff of Clarence's negligence, if any were shown.

As hereinbefore stated, on cross-examination of Clarence, defendant referred to his statement on direct that he was always careful about his speed while driving, and asked him if there was any special reason for this carefulness, and if it was his habit to keep within the speed limit. Up to this point no objection was made by plaintiff. Defendant then asked Clarence if it was not a fact that from the time he came to California until the accident he had received four or five speeding tickets. Plaintiff objected to that question and those already answered on the ground that the questions were incompetent, irrelevant and immaterial. Thereupon counsel repaired to chambers. Considerable discussion followed during which plaintiff stated that he was going to move to strike "any and all of this type of testimony as being incompetent, irrelevant

and immaterial for the following reason : That in the pleadings of this case there has not been pleaded any negligence of the witness in question [Clarence]." The judge overruled the objection. On returning to the courtroom defendant proceeded without any further objection to examine Clarence concerning the speeding tickets. This is the only time during the entire trial that plaintiff made any reference to Clarence's negligence not having been pleaded. Actually, in order to show that Clarence's negligence was the cause of the accident, no pleading alleging his negligence was necessary. Under defendant's denial that the accident was caused by any negligence on its part, it was entitled to show that the accident was not caused by it but by Clarence. The objection that the testimony was incompetent, irrelevant and immaterial because Clarence's negligence was not pleaded, is not an objection upon the ground that imputation of the negligence of Clarence to plaintiff was not pleaded. Nowhere was any reference or objection made on the ground that imputation of negligence had not been pleaded. Considerable cross-examination of Clarence ensued bearing on the question of his negligence in operating the automobile, all this without objection by plaintiff. Plaintiff himself first brought out the fact that plaintiff was one of the registered owners of the automobile, and introduced much testimony directed to the contention that although a registered owner, plaintiff really had no actual ownership. Defendant without objection cross-examined at length on this subject. Plaintiff then went into it on redirect, again. No objection was made to defendant's going into the subject further on recross-examination of plaintiff. Thereafter plaintiff testified further on the subject and was again cross-examined, without objection. Defendant offered the registration certificate in evidence, to which plaintiff made no objection.

Shortly after the registration certificate was introduced in evidence defendant's counsel stated: ". . . in view of the testimony that came up today regarding the question of the ownership of this car and what flowed therefrom under Code Section 402, I will ask leave to submit some additional instructions, and I may get some additional ideas from these of the plaintiff's that I just received." He stated that he assumed that he would have plenty of time to do this before the case was submitted to the jury. Plaintiff made no objection to defendant's request. Both parties offered in-

structions on the subject of the negligence of Clarence and imputation of negligence.

During the trial, the subject of instructing on imputation of negligence came up and considerable discussion followed. During it the court stated that it had given plaintiff's counsel one of the proposed instructions on that subject because "it would be a very important point to decide here." Plaintiff presented to the court a "Brief Memorandum Regarding Registration as Proof of Ownership." A discussion followed, at the end of which the court requested further "cases on imputation." Thereafter plaintiff presented a 12-page "Supplemental Brief on Imputation of Negligence Instructions." At no time during the discussion or a later discussion on the same subject, nor in the briefs, did plaintiff refer to the lack of a pleading of imputation of negligence. Plaintiff offered nine instructions on the subject of imputed negligence, including one giving the definition of "Registered Owner" in section 68, Vehicle Code.

Moreover, neither on his motion for new trial nor in either of his briefs in this court did plaintiff contend that the instructions on imputation of negligence were erroneous because of any defect in the pleadings. It was mentioned by him for the first time at oral argument. In spite of the one objection made by plaintiff that the negligence of Clarence had not been pleaded (as before stated there was no objection that imputation of negligence had not been pleaded) it is clear from the record that the parties tried the case upon the theory of imputed negligence.

3. (b) *Imputation of Negligence—Instruction Proper.*

The court instructed that it was established that at the time of the accident plaintiff was one of the registered owners of the automobile and that it was being used by Clarence with plaintiff's permission; therefore, if Clarence was negligent in its operation, such negligence was imputable to plaintiff. Plaintiff requested and the court refused instructions to the effect that the certificate of registration does not conclusively establish ownership, that although Wayne's name appeared on the title to the car, if he actually owned no interest in it, Clarence's negligence was not imputable to plaintiff, and that it was a question of fact for the jury to determine the question of ownership.

Section 402, Vehicle Code (presently § 17150) imputed to the owner of a motor vehicle the negligence of any

person using or operating it with the owner's permission, express or implied. Under this statute the negligence of the driver is imputed to the owner whether he be plaintiff or defendant. *(Lambert* v. *Southern Counties Gas Co.* (1959) 52 Cal.2d 347 [340 P.2d 608].)

The certificate of ownership of the automobile at the time of the accident stated, "Travis, Clarence R. or Wayne W." Plaintiff conceded that he was one of the registered owners, as on his arrival in California he had the car reregistered in both names. He signed the note for the automobile's purchase and also signed the certificate of ownership. There was evidence that Clarence paid for it, kept it in repair and operated it from his own funds. The plaintiff claimed that the reason his name was on the registration certificate was because of the son's age. In *Collard* v. *Love* (1936) 17 Cal. App.2d 72 [61 P.2d 458], the defendant Coffman was the registered owner of the car which injured the plaintiff, although the legal owner was a certain corporation. Section 1714-1/4, Civil Code, then provided as did section 402, Vehicle Code, at the time of the accident in our case, that "every owner" of a motor vehicle should be liable for negligence in the operation of the vehicle by a person using it with the owner's permission. The trial court refused to permit Coffman to prove that he had no interest in the vehicle, that it belonged to the defendant Love who had transferred it to him. In upholding the trial court the reviewing court said (p. 73): "The basis of respondent's claim for damages is section 1714-1/4 of the Civil Code as it was in force on the date of the accident. That section provided that 'every owner' of a motor vehicle should be liable for negligence in the operation of the vehicle by a person using it with the permission of the owner. The section did not distinguish between the registered owner and the legal owner but merely used the expression 'every owner.' The use of the word 'owner' has, however, been made definite in the case of *Bunch* v. *Kin,* 2 Cal.App.2d 81 [37 P.2d 744], where it is held that the word 'owner' as used in this section refers to the 'registered owner'. The evidence of ownership was sufficient to bring appellant within the provisions of section 1714-1/4 of the Civil Code. Appellant did not offer proof attacking the registration in his name. The ruling of the court on the admission of evidence was proper."

In *Dorsey* v. *Barba* (1952) 38 Cal.2d 350 [240 P.2d 604], the automobile was purchased with community funds and

registered in the wife's name. Before the accident the parties had separated and in a property settlement the wife had transferred all of her interest in the car to the husband. She had never driven it. The husband negligently operated the automobile, injuring the plaintiff. The court held (pp. 353-354): "It is clear, however, that a person may be liable as an owner under section 402 even though he does not have 'all the incidents of ownership.' That section provides that *every owner* of a motor vehicle is liable for imputed negligence except conditional vendors, their assignees, and chattel mortgagees, when those persons are out of possession. . . . Catherine, as sole registered owner of the automobile, obviously is included in the term 'every owner,' and since she is not within the exceptions she can avoid liability only by showing she did not actually consent or had no power to consent to Vincent's use of the car."

In *McCalla* v. *Grosse* (1941) 42 Cal.App.2d 546 [109 P.2d 358], the court said (p. 549): "The complaint contains clear and positive allegations of ownership in defendants Stover. The provisions of section 402 of the Vehicle Code have long been a part of the law of this state and have given rise to several decisions by reviewing courts. In *Bunch* v. *Kin,* 2 Cal.App.2d 81 [37 P.2d 744], it was held that the owner who became liable for the negligent acts of the person permitted to use an automobile on the streets was the 'registered owner'. The statute in force at the time of the decision in that case was substantially the same as section 402 of the Vehicle Code and it was held that the provisions that the vendor under a conditional sale contract prior to repossession of the car was not to be deemed the owner under the section showed the legislative intent to make the registered owner the party liable."

In *Stoddart* v. *Peirce* (1959) 53 Cal.2d 105 [346 P.2d 774], the court said (p. 115): "There is no doubt that the word 'owner' as used in section 402 for the purpose of creating a liability thereunder, is not synonymous with that word as used in the ordinary sense of referring to a person or persons whose title is good as against all others. Under the Vehicle Code there may be several such 'owners' at any one time. One or more persons may be an 'owner,' and thus liable for the injuries of a third party, even though no such 'owner' possesses all of the normal incidents of ownership *(Dorsey* v. *Barba,* 38 Cal.2d 350, 353 [240 P.2d 604])."

In *Jay* v. *Miner Trucking Co.* (1961) 14 App.Div. 398 [221

N.Y.S.2d 380] (certiorari denied 180 N.E.2d 894) dealing with a statute similar to section 402, the question presented was "whether the registered owner, present in the car . . ., may deny actual ownership to escape the imputed negligence of the driver when seeking to recover, as distinguished from seeking to escape liability." (P. 381 [221 N.Y.S.2d].) The court refers to the fact that it had long been established in New York that no registered owner could escape liability by asserting that he is not the actual owner when tort liability is asserted against him. The court then said that there seemed to be no logical reason why the same rule should not apply to a plaintiff seeking to impose liability and that the same considerations of public policy are present. "One who certifies to a fictitious ownership should not be permitted to disclaim, whether for the purpose of avoiding liability or imposing liability upon another. . . . To hold otherwise would open the door to fraud and trickery and create complete confusion as to responsible ownership." (P. 381 [221 N.Y.S.2d].)

In *Dorsey* v. *Barba, supra,* 38 Cal.2d 350, 354, the court said: "The requirements for registration were enacted in the interests of public welfare, and *one* of the purposes for the legislation is to afford identification of vehicles and persons responsible in cases of accident and injury." (Emphasis added.) It then states that where the registration shows the names of both husband and wife, the statute discloses their identity and that if an accident occurs while the husband is driving "there may be some justification for permitting the wife to explain and amplify the record by showing the true status of her ownership" but if the registration is in her name alone and she gives the husband permission to use the car the purpose would be defeated if she were permitted to contradict the record by showing that she merely had a community interest and no power to give permission. ▮▮▮▮ Although, as said in *Dorsey, one* reason for the statute is to show a party injured in an automobile collision the *identity* of the persons responsible for his injury, is not another reason that of holding responsible any person who has such a close connection with the driver of the car as to be the registered owner of it, and presumably because of that fact required either expressly or impliedly to give permission to drive it, and would not such reason apply in a case where the injured registered owner is injured by the negligence of his coregisteree concurring with that of a third party? We think that it would.

434

## 4. *Other Instructions.*

The court instructed: "Proof of such speeding tickets was for the purpose of impeachment only of Clarence Travis and is not evidence of the fact that he was negligent . . ." Thus far, the instruction was practically the same as one offered by plaintiff. However, the court added the following: "but may be considered by you on the question of the negligence of Wayne Travis, if any." There was no error in this statement. There was evidence that plaintiff, when he rode with Clarence, was aware of the general way in which the latter drove and knew that Clarence "got a few tickets" around the Brentwood area and had received a ticket in southern California. There was also evidence that Clarence was driving 60 to 70 miles per hour as the car passed the witness Patrick about 100 feet from the crossing. The jury were entitled to consider on the question of plaintiff's negligence the fact that plaintiff with knowledge of Clarence's propensity for speeding allowed Clarence without objection to speed into the oncoming train.

Plaintiff complains of several instructions given by the court which he admits are correct statements of the law but which he claims served only to confuse the jury. Defendant's instruction No. 6 is to the effect that the warning devices at the crossing conformed to the requirements of the California Public Utilities Commission and constituted lawful protection as prescribed by that commission. Supplementing it the court gave three instructions offered by plaintiff to the effect that the standards of the Public Utilities Commission are minimum standards and that the railroad's duty to exercise reasonable care was not necessarily fulfilled by complying with the commission's regulations issued by the commission. These instructions on the subject constituted fair statements of the law. (See *Lloyd* v. *Southern Pac. Co.* (1952) 111 Cal.App.2d 626, 638 [245 P.2d 583]; *Pobor* v. *Western Pac. R. R. Co.* (1961) 55 Cal.2d 314 [11 Cal.Rptr. 106, 359 P.2d 474].)

Additional instruction No. 6 is to the effect that it is presumed that the Public Utilities Commission had performed its function of seeing that this particular crossing conformed to the standards of safety and in the absence of proof to the contrary the jury must find in accordance with the presumption. Unfortunately the language of this instruction was very strong, but when read with the other instructions the sting was taken out of it, for the jury were definitely in-

formed that there was still a duty of care on defendant and that compliance with the commission's requirements was the least amount of care permissible.

▆▆▆▆ Defendant's instruction No. 26 was to the effect that the fact that a railroad signal fails to operate does not relieve persons approaching the crossing of their duty to use ordinary care to avoid being struck by approaching trains. This correctly stated the law. (See *Will* v. *Southern Pac. Co.* (1941) 18 Cal.2d 468, 474-475 [116 P.2d 44]; *Toschi* v. *Christian* (1944) 24 Cal.2d 354, 360 [149 P.2d 848].) Moreover, the court gave plaintiff's instruction to the effect that the jury might consider whether the conditions maintained by defendant and also its conduct were such as to give a reasonably prudent person assurance of safety in entering upon the track and to expressly or impliedly invite plaintiff to cross the track without making the usual precautionary observances. Additionally the court instructed that a traveller approaching a railroad crossing where protective devices had been installed was not required to use the same quantum of care as at a crossing not so protected.

▆▆▆▆ Defendant's Additional Instruction No. 8, dealing with contributory negligence of a passenger in an automobile, correctly stated the law. (See *Pobor* v. *Western Pac. R. R. Co., supra*, 55 Cal.2d 314, 324.) It charged that a passenger might be guilty of contributory negligence if "there were any special circumstances in connection with the automobile ride . . . which would have caused a reasonably prudent person situated as the plaintiff was situated to have taken precautions for his safety which the plaintiff did not take." Plaintiff contends that there was no evidence of any "special circumstances" which could have required plaintiff as a reasonable person to take any precautions. There was evidence of circumstances which the jury could have determined required plaintiff to take some precaution. He was riding in a car going 60 to 70 miles per hour; he was familiar with the crossing; there was evidence the train whistle was blowing and the wigwag working; in plain sight ahead of him was the Villicano car waiting for the train to go by.

These very circumstances justified the instruction on assumption of risk. ▆▆▆▆ The elements of the doctrine of assumption of risk are voluntariness of exposure to danger and actual knowledge of the risk assumed. (See *Morton* v. *California Sports Car Club* (1958) 163 Cal.App.2d 685, 688 [329 P.2d 967].) ▆▆▆▆ The instruction advised that if the jury

found that prior to the accident plaintiff knew that his son was a reckless driver and with knowledge of such fact exposed himself to danger by accepting a ride with him, plaintiff would be assumed to have taken the risk of driving with his son. The instruction conditioned such an assumption on the requirement that the jury also find that plaintiff took no special precautions to avoid any of the risks which riding with his son would entail. Plaintiff knew that his son had received "a few tickets" for speeding, and was aware of the general manner in which his son drove. See *Cooke* v. *Stevens* (1961) 191 Cal.App.2d 457, 461 [12 Cal.Rptr. 828], holding, " ... the evidence need not compel a conclusion, as a matter of law, that defendant knew. Knowledge, like any other fact, may be inferred from proven facts; indeed, unless a party admits knowledge, in the nature of the case there can be no other way to prove it."

In *Weis* v. *Davis* (1938) 28 Cal.App.2d 240 [82 P.2d 487], the defendant, a car demonstrator, was demonstrating a car to the plaintiff. The defendant accelerated the car to 72 miles per hour to which speed plaintiff consented. The defendant took his attention off the road turning to speak to the plaintiff and then focused his regard on the speedometer. The court said that while the plaintiff assumed the risk of going 72 miles per hour he did not assume the risk of the defendant taking his eyes off the road. This case is distinguishable from the instant case because if plaintiff consented to anything it was Clarence's whole mode of driving. In *Cooke* v. *Stevens, supra,* 191 Cal.App.2d 457, the plaintiff got into a car with a driver who was drunk. It was held that if the plaintiff knew of the driver's condition then the jury could assume that the plaintiff assumed the risk that the driver would be negligent in his driving. Here, if the jury found that plaintiff knew the nature of Clarence's citations then it could have found that plaintiff assumed the risk that Clarence would be negligent. There was substantial evidence, although contradicted, to justify an instruction on assumption of risk.

### 5. *Alleged Misconduct of Judge.*

The statements of the court which plaintiff now contends constituted misconduct are so far from being misconduct that they do not justify being detailed here. ▮▮▮ The court was well within its rights in admonishing a witness to speak up so the jury could hear him, in suggesting that the read-

ing of depositions give way until after the calling of "live" witnesses who were in attendance upon the court.

Nor was there anything wrong, in view of the obvious fact that Villicano was equivocating, in the court reminding him that he was under oath and in giving him a chance at the end of his examination to change his testimony.

While the court should have admonished the jury as requested to disregard a remark of defendant's counsel which might possibly have charged plaintiff's counsel with improper motives in not calling Villicano, it is evident from the record that in the discussion between counsel that followed, the fact of the request to the court was overlooked. In any event, no prejudice could have resulted.

Plaintiff's counsel asked permission to remove a portion of one of defendant's exhibits. The court in an obviously jocular mood suggested that plaintiff not tear up any of the Southern Pacific records, at least while "we are all looking." Plaintiff's claim that the remark would cause the jury to suspect plaintiff's counsel of using questionable tactics is unfounded.

During the examination of Salvadore, when it was obvious to the court that the witness was not telling the truth when he said that the only question asked of him by the officer was as to his name, the court reminded Salvadore that he was under oath and "supposed to tell actually what you saw" and "Otherwise, you might go to jail." At the end of the examination by counsel the court said, "All right. Now, is there anything in the testimony that you gave that you want to change now?" Plaintiff concedes that Salvadore was fabricating. In such a situation the judge should not sit supinely by and not remind the witness that he is under oath. There is nothing improper in the judge making an effort to get the witness to tell the truth, when, as here, it was obvious to everyone in the courtroom that he was not doing so.

Plaintiff contends that the trial judge's attitude, his voice and facial expressions all indicated strong feelings against plaintiff and plaintiff's counsel. A reading of the transcript fails to show any indication in the record of any such feeling. Obviously the judge's voice, facial expression and unexpressed attitude do not and would not appear in the record. See *People* v. *Nielson* (1960) 183 Cal.App.2d 20 [6 Cal.Rptr. 367], and *People* v. *Cox* (1959) 174 Cal.App.2d 30 [344 P.2d 399], holding that such matters (if they occurred) may not be considered on appeal unless objection is

made thereto in the trial court. However, at no time did plaintiff indicate that the judge in these respects was acting improperly. There were conferences in chambers where in the absence of the jury counsel could have expressed some concern about the judge's mannerism, if deemed objectionable. This was not done. The trial was of considerable length (over 1900 pages of testimony). There was much bitterness of counsel towards each other. The record indicates that the judge was patient and apparently objective throughout the trial.

6. *Alleged Misconduct of Defendant's Counsel.*

 As above related, defendant's counsel . made a statement which might be construed as charging plaintiff with suppressing evidence in not calling Villicano to the stand. It was obviously one of those remarks engendered by the heat of battle and which should not have been said, but which could not have caused prejudice. Moreover, the court had stated that it was plaintiff's privilege not to call a witness if he did not wish to.

Plaintiff complains of the conduct of defendant's attorney in connection with the attempted impeachment of Officer Taylor. On direct examination plaintiff asked Taylor concerning the physical situation at the crossing when the latter arrived there shortly after the accident. He then asked, "And have you got any knowledge concerning the operation of the wigwag at the time of the accident?" The officer responded "No." Just what plaintiff had in mind in asking this question does not appear. Clearly the officer's knowledge of the operation of the wigwag at a time when he was not there could only have been based on hearsay. We think the officer answered properly. (He later explained his answer to the effect that although Salvadore had told him the wigwag was working he had been asked as to · his own knowledge.) On the theory that plaintiff had opened the door by this question and that defendant was entitled to impeach Taylor, defendant's counsel attempted to get into evidence Salvadore's statement. The court properly ruled it inadmissible. Later, in chambers, defendant's counsel stated that in further attempt to impeach Taylor, defendant intended to bring out from the witness Allison, defendant's signal maintainer, that Taylor had told him that Salvadore had stated that the wigwag was working. The court properly ruled such testimony inadmissible. Nevertheless, in open

court, defendant's counsel asked Allison what Taylor had told him. The court sustained an objection to the question. The attempt to get Salvadore's statement before the jury in this matter was improper, and defendant's counsel should not have attempted it. However, in both instances the court admonished the jury to disregard the question and not to draw any implications or surmises from it. (See *Jonte* v. *Key System* (1949) 89 Cal.App.2d 654, 659 [210 P.2d 562], as to the effect of such admonitions.) Therefore, and because later Salvadore's statement to the officer was properly admitted in evidence, there could be no prejudice resulting from defendant's counsel's conduct.

As to other actions of defendant's counsel to which plaintiff now objects, either no objection or assignment was made to them in the trial court, or if made, the court instructed the jury to disregard them. This was a trial hotly contested by both counsel. Both counsel made remarks which probably should not have been made. However, no prejudice resulted.

Clarence and plaintiff were the only witnesses who testified that the wigwag was not working at the time of the accident. Marshall Tuttle, Kernie Elliott, Walter Patrick, Marshall Elliott, John Ward and Robert Ede testified that it was working at that time. The police officer and defendant's signal maintainer testified it was working after the accident. Seven witnesses testified that the train sounded its whistle as it approached the crossing. Clarence testified that he heard a whistle when he was about 120 feet from the crossing. Clarence and plaintiff had an unobstructed view of 100 feet before they ran into the train. Clarence on his own testimony when he saw Salvadore's car stopped on the other side of the crossing did not start to slow down until it was too late. Plaintiff had the burden of showing defendant's negligence. The evidence of defendant's negligence, at best, is very weak, while the evidence is strong to the effect that Clarence carelessly and negligently ran his car into the side of the train.

The judgment is affirmed.

Sullivan, J., and Molinari, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied January 30, 1963. Traynor, J., and Tobriner, J., were of the opinion that the petition should be granted.