[Civ. No. 21941. First Dist., Div. One. May 27, 1966.]

ALFRED TAVERNIER, Plaintiff and Appellant, v.
LELAND MAES, Defendant and Respondent.

Barton, Farrow & Barton and Harold R. Farrow for Plaintiff and Appellant.

Nick L. M. Elchinoff for Defendant and Respondent.

SIMS, J.—Plaintiff has appealed from a judgment for the defendant entered on a jury verdict in an action in which he sought to recover damages occasioned by and attendant to a fractured ankle suffered when the defendant slid into him in the course of a family softball game.

He asserts that prejudicial error resulted when the trial court submitted the question of assumption of risk to the jury.

More specifically he urges that the defendant produced no evidence to entitle him to the benefit of the doctrine of assumption of risk, that the instructions which were used were erroneous and erroneously given, and that the error in giving these instructions was prejudicial.

An examination of the facts and pertinent law induces the conclusion that the defendant was entitled to have the issue of the applicability of the defense of assumption of risk left to the jury, and that the instructions which were given properly set forth both the criteria for determining if the doctrine should be applied and the elements it was necessary to establish before it could defeat recovery.

On July 4, 1961, plaintiff and defendant were each members of a group of 14 adults and 12 young children, of an age of 12 and under, who attended a family picnic at Robert's Recreation Area, a public park. Similar family picnics had been held in prior years and the participants customarily assembled in the forenoon, leisurely partook of their lunch, and then engaged in a game of softball with all but the very eldest and very youngest participating. The group was principally the family of plaintiff's wife, consisting of her brothers, Felix Maes and the defendant Leland Maes, and their wives, her sister, Mrs. Cain, and her husband, the Maes' mother and her husband, and the grandparents on the Maes' side of the family. One other couple, and the children, completed the assemblage.

On this occasion, after lunch, the ball was lobbed around at the picnic grounds, and then the plaintiff and others drove down to the baseball field to have a game of ball. The ball field they had played on in prior years was occupied, or under repair, so they went to a makeshift field adjacent to it. It had a backstop, but no grass, only stubble, and the terrain was rough. There were no base bags, just improvised bases, and second base was defined by a hole in the ground. Everyone rotated around in order to keep the men in the strong positions, on the bases or in the outfield, because they could play better, and the women were pitching or catching or playing where they would not be apt to make so many errors. A hit to right field was an automatic out because they had no right fielder. Plaintiff's team consisted of himself and his wife, Mr. and Mrs. Cain, and their 12-year-old boy and defendant's 8- and 6-year-old daughters. Defendant's team was predominately adults, both men and women.

After the game had been in progress an hour or more the defendant was at bat (according to all witnesses but plaintiff, who placed him as a runner at first base with his brother Felix at bat), the plaintiff's wife (defendant's sister) was pitching, and the brother-in-law Cain was playing left field. The pitcher lobbed the ball in underhand and defendant hit the ball to left field. Cain started to run up on the ball, but then waited for it to come to him because of the rough terrain. Plaintiff at second base was aware of the approaching defendant as a base runner, but did not see him because he was turned to take the perfect throw which Cain made to him with the intention of tagging defendant out.

Somewhere between first and second base the defendant, after watching Cain launch the throw to plaintiff, upon an impulse or natural reflex to get out of the way of the ball, because he confessedly would not have wanted to slide on the rough pebbly ground, decided to slide into second base. Defendant claimed it always had been in his mind that he slid because the ball might hit him, but admitted he did not say anything to that effect on the day of the accident or in his prior deposition, and first mentioned it after his deposition was taken when discussing that event with his wife. He acknowledged that there were two kinds of slide: a hook-slide where in order to evade a tag the runner slides to right or left of the base and tries to touch the base with his foot; and another type of slide where in order to break up a double play the runner slides straight into the defending baseman with his feet high for the express purpose of knocking him down. It was established that the defendant knew how to make both of these slides; that he had played organized softball, participated in football and hardball baseball in high school; that subsequently as a playground director he had taught others how to slide; and that he had only played sand-lot or picnic-type baseball since leaving the Recreation and Park Department for which he worked for a year and a half following his graduation from high school in 1949. Defendant testified that on this occasion he had no particular type of slide in mind; that he had no intention of sliding into plaintiff and knocking him down; that he was not attempting to break up a double play; and that he was trying to evade plaintiff and reach second base as defined by a hole in the ground.

The plaintiff testified that there had been at least one close play in the game; that he had physically tagged another player out; that no one had slid into any base that day; and

that there had been no sliding in prior family picnic games. He acknowledged that he had played softball previously and had witnessed softball games and had seen people slide into second or third base in games he had witnessed on television. His brother-in-law Cain, and the defendant himself, both confirmed that there had been no sliding in this or prior family picnic games. Cain had played ball with plaintiff before, once in a great while, and had observed him drop a ball thrown to him on occasions. Defendant had observed the plaintiff play ball at prior family picnic games, and considered him a fairly good ball player, but thought he would not catch the hard-thrown ball.

The defendant testified that in his slide he was laying almost on his back with his weight on his left thigh, his left leg cocked under him to keep it out of the way, and his right leg out straight in the air a foot or two off the ground; that he was sliding right at second base; that it was not a hook-slide; that he hit the plaintiff below the knee, at his ankle or calf, with what he indicated was his lower left leg; and that he knocked plaintiff down, but did not know whether plaintiff's ankle was injured by the impact or a subsequent fall. Cain testified that the defendant made a normal slide; that he was running as fast as he could and left his feet to start his slide about three quarters of the way from first base to second base; that his feet went straight toward plaintiff; and that upon contact the plaintiff went up in the air and came down on his knees. The plaintiff testified that he was hit as he caught the ball—almost simultaneously; that he could not recall whether the slide knocked him down, but he thought that he retained his feet, or at least that he came down on his feet if he had been knocked in the air; that he detected a terrific pain in his leg, saw it was bent at a grotesque angle, and dropped to his knees.

He was taken to the hospital and it was found that he had fractured both the outer and inner bone of his left ankle. The inner bone failed to grow together and it was necessary to perform a bone graft later.

On this state of the evidence the court instructed the jury that the issues were the negligence of the defendant, proximate cause and assumption of risk.[1] No instructions were

[1] This part of the instruction defining the issues read as follows: ''Did the plaintiff Tavernier assume the risk of the defendant's sliding into him when the defendant was approaching the spot where he was standing? If you find that he did assume that risk, again your verdict must be for

given on contributory negligence. The instructions then advised the jurors to determine the question of liability before undertaking to fix any amount of damages, set forth the standards for burden of proof, placed that burden on the plaintiff for the issues of negligence, proximate cause and damages, and on the defendant for assumption of risk.[2] They were told: ''In determining whether or not any issue has been proved by a preponderance of the evidence, you should consider all of the evidence bearing on that issue, regardless of which party produced it.'' The court continued with general instructions defining negligence and proximate cause, and then gave the specific instructions on assumption of risk of which, along with the two instructions on the subject previously noted (fns. 1 and 2), the plaintiff complains.

Plaintiff, while asserting that the issue was not properly raised by the evidence, had presented instructions embodying the content of instructions numbered 207, 207-A and 207-B as found in California Jury Instructions, Civil, 4th edition (1956).[3] The court modified the first, and gave the following: ''I have heretofore mentioned to you that the defendant here sets up the defense that the plaintiff assumed the risk of what happened as shown by the evidence. That is known as the

---

the defendant; but if you find that Mr. Tavernier did not assume that risk, and if you have previously found that Mr. Maes' negligence was a proximate cause of Tavernier's injury, you will then proceed to fix the amount of plaintiff's damages and return a verdict in his favor.''

[2] This portion of the instruction on burden of proof was as follows: ''To establish the defense that the plaintiff assumed the burden of risk—and I will later define that term for you—to establish that defense the burden is upon the defendant to prove that the plaintiff assumed the risk, if any, which was incidental to the conduct in question.''

[3] These instructions were approved in *Ching Yee* v. *Dy Foon* (1956) 143 Cal.App.2d 129, 137-138 [299 P.2d 668]. Subsequently, in *Shahinian* v. *McCormick* (1963) 59 Cal.2d 554 [30 Cal.Rptr. 521, 381 P.2d 377], the court overruled *Ching Yee* on this point and stated: ''Actual knowledge of the particular risk and appreciation of the magnitude thereof are not interchangeable but are independent and essential elements of the doctrine. [Citations.] The two elements are distinct concepts, intended to convey two independent ideas to the jury. Proper instructions should embody both concepts. Thus the instructions given on the doctrine were inadequate.'' (59 Cal.2d at p. 567; see also *Goodwin* v. *Bryant* (1964) 227 Cal.App.2d 785, 789-791 [39 Cal.Rptr. 132]; and Notes to Instructions 207, 207-B and 207-D, BAJI (P.P. 1964); but cf. *Grey* v. *Fiberboard Paper Products Co.* (Cal.App. 1966) wherein *Shahinian* was overlooked, and a hearing was granted in the Supreme Court, April 13, 1966.)

Instruction 207-A has been withdrawn because of criticism in dissenting opinion of *Vasquez* v. *Alameda* (1958) 49 Cal.2d 674, 680-681 [31 P.2d 802] and in *Hidden* v. *Malinoff* (1959) 174 Cal.App.2d 845, 851-852 [345 P.2d 499]. (See Note to Instruction 207-A, BAJI (P.P. 1964).)

defense of assumption of risk, and I will now explain it to you: A person is said to assume a risk when he knows that a danger exists in the conduct of another during the ordinary course of a game or activity, and with that knowledge he nevertheless voluntarily exposes himself to that danger. A person who thus assumes a risk is not entitled to recover for damage caused him without intention and which resulted from the dangerous conduct to which he thus exposed himself.'' The second was refused by the court and the third was modified to include a reference to an appreciation of the magnitude of the danger, so that it read as follows: ''It should be noted that in order to bar recovery, assumption of risk must be voluntary. To be voluntary these two factors must be present, both of them: first, the person in question, namely, the plaintiff here, must have had actual knowledge of the danger involved and an appreciation of the magnitude of that danger; and second, he must have had freedom of choice. This freedom of choice must come from circumstances which provided him a reasonable opportunity to safely refuse to expose himself to the danger in question.'' The instructions on damages followed; and, in conclusion, the court gave general instructions concerning the manner in which the jurors should perform their duties. In the course of the introductory instructions they were instructed: ''You should not single out any certain sentence or any individual point or instruction and ignore the others. You are to consider all these instructions as a whole and regard each in the light of all the others.'' (Cf. 1 BAJI (P.P. 1964) 18, Instruction No. 2 (revised).) In the concluding instructions the court stated: ''I have given you instructions, ladies and gentlemen, embodying such rules of law as may be necessary to assist you in arriving at a verdict. As to some of these instructions, their application depends, of course, upon the light in which you view the evidence.'' (Cf. 1 BAJI (4th ed. 1956) 100-101, Instructions No. 35 and 35-A.)

The rules for determining the propriety of instructing the jury in relation to any particular principle of law are well established. ■ ''Each litigant is entitled to have instructions submitted to the jury on all theories of the case which find support in the pleadings and the evidence. [Citation.] ■ Thus, if there is sufficient evidence to support the giving of instructions on a particular subject, it is a question of fact for the jury's determination whether the evidence will

support a judgment. ▮ Such actual knowledge may be established by circumstantial evidence from which the knowledge of the fact in question can be reasonably inferred. [Citations.]'' (*Christensen* v. *Malkin* (1965) 236 Cal.App.2d 114, 118-119 [45 Cal.Rptr. 836]; accord: *Chapman* v. *Reliance Equipment Co.* (1963) 214 Cal.App.2d 221, 224 [29 Cal.Rptr. 500]; *Ziegler* v. *Santa Cruz etc. School Dist.* (1961) 193 Cal. App.2d 200, 203 [13 Cal.Rptr. 912]; and see *Goodwin* v. *Bryant* (1964) 227 Cal.App.2d 785, 791 [39 Cal.Rptr. 132]; *Wagner* v. *Osborn* (1964) 225 Cal.App.2d 36, 49-50 [37 Cal. Rptr. 27]; *Hook* v. *Point Montara Fire etc. Dist.* (1963) 213 Cal.App.2d 96, 99 [28 Cal.Rptr. 560].)

▮ It is proper to give an instruction on the doctrine of assumption of risk where the evidence shows that the victim voluntarily placed himself in a situation of known danger with knowledge and appreciation of the risk involved. (*Christensen* v. *Malkin, supra,* 236 Cal.App.2d 114, 119; *Cooper* v. *Lunsford* (1965) 234 Cal.App.2d 554, 560 [44 Cal.Rptr. 530]; *Romero* v. *And'ra* (1963) 216 Cal.App.2d 295, 302-303 [30 Cal.Rptr. 645]; *Chapman* v. *Reliance Equipment Co.* (1963) 214 Cal.App.2d 221, 223-224 [29 Cal.Rptr. 500]; *Travis* v *Southern Pacific Co.* (1962) 210 Cal.App.2d 410, 435-436 [26 Cal.Rptr. 700]; *Ziegler* v. *Santa Cruz etc. School Dist., supra,* 193 Cal.App.2d 200, 202-205; *Warren* v. *Sullivan* (1961) 188 Cal.App.2d 150, 153-154 [10 Cal.Rptr. 340]; *Ching Yee* v. *Dy Foon* (1956) 143 Cal.App.2d 129, 137-140 [see fn. 3] [30 Cal. Rptr. 521, 381 P.2d 377]; *Gallegos* v. *Nash, San Francisco* (1955) 137 Cal.App.2d 14, 19-20 [289 P.2d 835]; *Knowles* v. *Roberts-at-the-Beach Co.* (1953) 115 Cal.App.2d 196, 198 [251 P.2d 389]; and see *Goade* v. *Benevolent etc. Order of Elks* (1963) 213 Cal.App.2d 189, 192-194 [28 Cal.Rptr. 669].)

▮ In fact failure to instruct where the issue of assumption of risk has been raised by the pleadings and the pretrial order, and there is any evidence upon which it can be predicated, is reversible error. (*Grey* v. *Fiberboard Paper Products Co.* (Cal.App. 1966) [see fn. 3]; and see *Chapman* v. *Reliance Equipment Co., supra,* 214 Cal.App.2d 221, 224; and *Kingery* v. *Southern Cal. Edison Co.* (1961) 190 Cal.App.2d 625, 636 [12 Cal.Rptr. 173].)

▮ On the other hand, it is equally clear that if there is no evidence upon which the doctrine may be predicated, it is error to give the instructions. ▮ ''In this state the rule is clearly established that before the jury may be properly instructed on the doctrine [of assumption of risk] there must

be evidence not only that the plaintiff knew that he was stepping into a place of danger, but also had actual knowledge of the specific danger involved." (*Vierra* v. *Fifth Ave. Rental Service* (1963) 60 Cal.2d 266, 274 [32 Cal.Rptr. 193, 383 P.2d 777]; *Boyles* v. *Hamilton* (1965) 235 Cal.App.2d 492, 500-501 [45 Cal.Rptr. 399]; *Cooper* v. *Lunsford, supra,* 234 Cal.App. 2d 554, 559-560 and 561; *Kemline* v. *Simonds* (1964) 231 Cal. App.2d 165, 170-171 [41 Cal.Rptr. 653]; *Goodwin* v. *Bryant, supra,* 227 Cal.App.2d 785, 791-792; *Rodriquez* v. *Lompoc Truck Co.* (1964) 227 Cal.App.2d 769, 777-779 [39 Cal.Rptr. 117]; *Wagner* v. *Osborn, supra,* 225 Cal.App.2d 36, 48-50; *Hartlerode* v. *Edwardsen* (1963) 219 Cal.App.2d 517, 520-522 [33 Cal.Rptr. 346]; *Hook* v. *Point Montara Fire etc. Dist., supra,* 213 Cal.App.2d 96, 99-106; *Hall* v. *Macco Corp.* (1961) 198 Cal.App.2d 415, 424-426 [18 Cal.Rptr. 273]; *Griffin* v. *Irelan* (1961) 194 Cal.App.2d 844, 845-849 [15 Cal.Rptr. 306]; *Hidden* v. *Malinoff* (1959) 174 Cal.App.2d 845, 849-851 [345 P.2d 499]; *Guerrero* v. *Westgate Lumber Co.* (1958) 164 Cal. App.2d 612, 617-618 [331 P.2d 107]; *Gold* v. *Hlivyak* (1955) 131 Cal.App.2d 39, 43 [280 P.2d 71].) ▪ If the issue is submitted to the jury without sufficient evidence to sustain a finding in favor of the party asserting the doctrine, the error is generally prejudicial and will require a reversal of a judgment against the party who was improperly subjected to consideration of that defense by the jury. (*Vierra* v. *Fifth Ave. Rental Service, supra,* 60 Cal.2d 266, 275; *Goodwin* v. *Bryant, supra,* 227 Cal.App.2d 785, 795; *Rodriquez* v. *Lompoc Truck Co., supra,* 227 Cal.App.2d 769, 779-780 [39 Cal.Rptr. 117]; *Hook* v. *Point Montara Fire etc. Dist., supra,* 213 Cal. App.2d 96, 106-107; *Griffin* v. *Irelan, supra,* 194 Cal.App.2d 844, 849; *Hidden* v. *Malinoff, supra,* 174 Cal.App.2d 845, 855.)

The controversy between the parties was originally postulated in the pleadings in which plaintiff alleged: "defendant negligently and carelessly, and without regard to the life, limb or safety of the other participants therein, including plaintiff herein, did propell [*sic*] himself through the air in such a manner so as to collide violently with plaintiff herein"; and defendant, in his answer countered: "all the risks and dangers, if any there were, connected with the situation at the time and place alleged in plaintiff's complaint on file herein were open, obvious and apparent and were known to and voluntarily assumed by the plaintiff herein." In the framework of negligence and voluntary assumption of risk, "the

victim must have not only general knowledge of a danger, but must have knowledge of the particular danger, that is, knowledge of the magnitude of the risk involved.'' (*Vierra* v. *Fifth Ave. Rental Service, supra,* 60 Cal.2d 266, 271.) Each party acknowledges the applicability of the foregoing rule, but comes to a different conclusion because of a different concept of the particular risk involved.

Defendant asserts that plaintiff as a participant in a game of baseball, who had played it on former occasions and had seen it played on television, must have known that base running and sliding were part of the game of baseball, and that there was a risk of injury from bodily contact on close plays. Plaintiff acknowledges that there may have been knowledge of and consent to the risk of being bumped and bruised by an approaching base runner in a family game, but that there was no knowledge of the particular risk which ensued—''a scythe-like blow between the ankle and the knees from behind, and without warning . . . in circumstances which would call for a hook slide, if *any* slide at all was justified in this game.'' (Italics plaintiff's.)

Plaintiff points to the family nature of this game and its participants, to the nature of the terrain, and to the fact his back was turned as requiring a finding that as a matter of law there could be no assumption of the risk referred to above. Defendant, on the other hand, contends that the evidence sustains a finding that the plaintiff was cognizant of the normal risks attendant to playing baseball, and that it was a question for the jury to determine whether or not this was the type of game in which a slide and the resulting bodily contact could be anticipated.

An examination of the cases referred to above is not particularly enlightening from a factual standpoint. They do confirm the general principle, acknowledged by both parties, that the victim must appreciate the particular risk and have an appreciation of the magnitude thereof, in addition to a general knowledge of danger.[4] They also establish, as defendant con-

[4]*Shahinian* v. *McCormick* (1963) 59 Cal.2d 554, 566-567 [30 Cal.Rptr. 521, 381 P.2d 377]; *Rogers* v. *Los Angeles Transit Lines* (1955) 45 Cal.2d 414, 418 [289 P.2d 226]; *Boyles* v. *Hamilton* (1965) 235 Cal.App. 2d 492, 500-501 [45 Cal.Rptr. 399]; *Cooper* v. *Lunsford* (1965) 234 Cal. App.2d 554, 559-560 [44 Cal.Rptr. 530]; *Goodwin* v. *Bryant* (1964) 227 Cal.App.2d 785, 790-791 [39 Cal.Rptr. 132]; *Rodriguez* v. *Lompoc Truck Co.* (1964) 227 Cal.App.2d 769, 777-779 [39 Cal.Rptr. 17]; *Wagner* v. *Osborn* (1964) 225 Cal.App.2d 36, 48 [37 Cal.Rptr. 27]; *Hartlerode* v. *Edwardsen* (1963) 219 Cal.App.2d 517, 521 [53 Cal.Rptr. 346]; *Hook* v. *Point Montara Fire etc. Dist.* (1963) 213 Cal.App.2d 96, 100-105 [28

tends, that actual knowledge of the risk may be inferred from the circumstances.[5] On the one hand, it is evident that assumption of the general perils of the street and moving traffic is not an assumption of the risk of harm from the specific negligence of another particular driver.[6] Yet one assuming the general risks of accident from driving with an operator whose ability is impaired from intoxication, or other causes known to the passenger, may assume the risk of the specific accident which in fact occurs.[7]

It is obvious that the phrases ''actual knowledge of the specific danger involved'', ''knowledge of the particular danger'', or ''knowledge of the magnitude of the risk involved'' do not connote that the victim had prescience that the particular accident and injury which in fact occurred was going to occur. If so, it is obvious that he would have avoided the hazard or be properly confined in a mental institution as would befit one who so defied fate. Nor does the assumption need rest upon that type of recklessness which is evidenced by ''Russian roulette.'' The specificity, particularity, and magnitude in question must refer to the scope and source of possible dangers. This concept has been stated as follows: ''We do not understand the rule to be that threat of injury has to be so great that it was probable. It suffices if it is known to be

---

Cal.Rptr. 560]; *Hall* v. *Macco Corp.* (1961) 198 Cal.App.2d 415, 425-426 [18 Cal.Rptr. 273]; *Hidden* v. *Malinoff* (1959) 174 Cal.App.2d 845, 850-851 [345 P.2d 499]; *Guerrero* v. *Westgate Lumber Co.* (1958) 164 Cal. App.2d 612, 618 [331 P.1d 107].

[5]Actual knowledge of the risk may be inferred from the circumstances. (*Gomes* v. *Byrne* (1959) 51 Cal.2d 418, 421 [333 P.2d 754]; *Christensen* v. *Malkin* (1965) 236 Cal.App.2d 114, 118 [45 Cal.Rptr. 836]; *Cooper* v. *Lunsford* (1965) 234 Cal.App.2d 554, 560 [44 Cal.Rptr. 530]; *Rodriquez* v. *Lompoc Truck Co.* (1964) 227 Cal.App.2d 769, 778 [39 Cal.Rptr. 117]; *Romero* v. *And'ra* (1963) 216 Cal.App.2d 295, 302-303 [30 Cal.Rptr. 645]; *Chapman* v. *Reliance Equipment Co.* (1963) 214 Cal.App.2d 221, 224 [29 Cal.Rptr. 500]; *Hook* v. *Point Montara Fire etc. Dist.* (1963) 213 Cal.App.2d 96, 100 [28 Cal.Rptr. 560]; *Travis* v. *Southern Pacific Co.* (1962) 210 Cal.App.2d 410, 435-436 [26 Cal.Rptr. 700]; *Ziegler* v. *Santa Cruz etc. School Dist.* (1961) 193 Cal.App.2d 200, 203 [13 Cal. Rptr. 912]; *Warren* v. *Sullivan* (1961) 188 Cal.App.2d 150, 154 [10 Cal. Rptr. 340]; *Ching Yee* v. *Dy Foon* (1956) 143 Cal.App.2d 129, 138-140 [30 Cal.Rptr. 521, 381 P.2d 377].)

[6]*Rogers* v. *Los Angeles Transit Lines, supra; Boyles* v. *Hamilton, supra; Goodwin* v. *Bryant, supra; Rodriquez* v. *Lompoc Truck Co., supra; Hidden* v. *Malinoff, supra.*

[7]*Christensen* v. *Malkin, supra; Cooper* v. *Lunsford, supra; Travis* v. *Southern Pacific Co., supra; Warren* v. *Sullivan, supra; Ching Yee* v. *Dy Foon, supra;* and see *Gallegos* v. *Nash, San Francisco, supra;* but cf. *Wagner* v. *Osborn* (1964) 225 Cal.App.2d 36 [37 Cal.Rptr. 27]; *Hartelrode* v. *Edwardsen, supra.*

within the range of possibilities; neither sure nor necessarily apt to happen; but one that will happen if the conditions are ripe for it.'' (*Grey* v. *Fiberboard Paper Products Co., supra* (see fn. 3).) ▮ If the accident and the resultant injury fall within general hazards as so defined of which the victim had knowledge he may be found to have assumed the risk thereof. By this test it appears that plaintiff concedes that he assumed the risk of being bumped or bruised by bodily contact on a close play. ▮ The fact the contact was by a slide, a movement commonly used in the game he was playing, and that the contact, or the results thereof (for it cannot be ascertained whether the broken ankle resulted from the blow or a contemporaneous fall or twisting) produced an injury which unfortunately was more serious than might ordinarily be expected should not deprive defendant of the defense as a matter of law. The questions of whether the plaintiff had ''actual knowledge of the danger involved and appreciation of the magnitude of that danger'' properly were left to the jury under appropriate instructions.

Another concept found in the cases and commentators is the principle that voluntary assumption of risk is predicated upon consent, express or implied.[8] ▮ ''In its simplest and primary sense, assumption of risk means that the plaintiff, in advance, has expressly given his consent to relieve the defendant of an obligation of conduct toward him, and to take his chances of injury from a known risk arising from what the defendant is to do or to leave undone.'' (Prosser, Law of Torts (3d ed. 1964) p. 450.) In an examination of the scope and effect of the consent evidenced by participation in sports one finds a dearth of authority in this state. It has been held proper to grant a nonsuit against a golfer playing in one fairway who was struck by a ball driven off a tee for play in an adjacent fairway. (*Strand* v. *Conner* (1962) 207 Cal.App. 2d 473 [24 Cal.Rptr. 584].) The opinion recites: ''Defendant contends that a golf player assumes the risk of hazards of this kind when he enters into the game. Plaintiff takes the contrary view and that whether or not there was a duty to warn is a question of fact for the jury. [Citations.]

---

[8]*Vierra* v. *Fifth Ave. Rental Service* (1963) 60 Cal.2d 266, 271 [32 Cal.Rptr. 193, 383 P.2d 777]; *Rogers* v. *Los Angeles Transit Lines* (1955) 45 Cal.2d 414, 419 [289 P.2d 226]; *Prescott* v. *Ralphs Grocery Co.* (1954) 42 Cal.2d 158, 161-162 [265 P.2d 904]; *Rodriquez* v. *Lompoc Truck Co.* (1964) 227 Cal.App.2d 769, 777-778 [39 Cal.Rptr. 117]; *Hook* v. *Point Montara Fire etc. Dist.* (1963) 213 Cal.App.2d 96, 101 and 105 [28 Cal.Rptr. 560]; *Gallegos* v. *Nash, San Francisco* (1955) 137 Cal.App.2d 14, 19 [289 P.2d 835].

"We are unable to agree entirely with either plaintiff or defendant. It is perfectly true that a player of a game where many hazards develop from player errors which cannot be classified as negligent, does assume the risk of injury from many of these hazards. The citations given by defendant clearly support this view. In each, however, the known customs of game play some part in this conclusion. For example, a person intentionally walking across in front of a player just about to swing on a fairway shot would undoubtedly assume the risk. On the other hand, if the player's ball were on the green ready to be putted, a person walking across on the far side of the green, even though this be a discourtesy, would not assume the risk of a ball driven from the green, for the rules and custom of the game strictly forbid anyone's driving a ball off the green itself." (207 Cal.App.2d at pp. 475-476.) Although the court headed its discussion "Assumption of Risk," the nonsuit was approved on the grounds that there was no evidence to show that defendant was negligent. (See also *Oakes* v. *Chapman* (1958) 158 Cal.App.2d 78, 86 [322 P.2d 241].) Defendant relies upon the forepart of the foregoing quotation, and plaintiff urges that defendant's slide under the circumstances of this case was analogous to the violation of rules and customs which is postulated in the last sentence. The case points up the apparent incongruity in stating that proof that plaintiff assumed the risk relieves the defendant of liability for his own negligence. As has been recognized, and will be discussed, the proof does not relieve the defendant of his negligence, but establishes that defendant's conduct was nonnegligent toward the victim, because he owed the latter no duty to conduct himself other than he actually did.

This point is further highlighted by the "spectator" cases. In *Morton* v. *California Sports Car Club* (1958) 163 Cal.App. 2d 685 [329 P.2d 967], the reviewing court used an approach predicated upon the affirmative defense of assumption of risk and found that defense established as a matter of law on the facts of the case. The evidence showed that plaintiff, who was struck by a wheel which came off a sportscar which went into a spin, was thoroughly familiar with sports car racing, knew the dangers thereof and voluntarily chose a position of danger at a turn from which to watch the races, although more protected and safer places were available. There was evidence to show that defendant as sponsor of the race was negligent in failing

to provide sufficient protection around the course for all spectators. The court, nevertheless, reversed a judgment on the verdict for plaintiff and ordered judgment for the defendant because the lower court had erred in denying its motion for a directed verdict and for judgment notwithstanding the verdict. In *Goade* v. *Benevolent etc. Order of Elks, supra,* 213 Cal.App.2d 189, *Morton* was qualified, and it was held error to grant a nonsuit as to a spectator without experience in attending a sports car race, who was injured by a car which went through a ''snow'' fence on a straightaway. This case is also in the framework of the affirmative defense of assumption of risk. The court reviewed other spectator cases, and enunciated its conclusions as follows: ''The courts of California have held that assumption of the risk of being hit by a flying puck in a hockey game is one of fact for the jury. (*Shurman* v. *Fresno Ice Rink, Inc.,* 91 Cal.App.2d 469 [205 P.2d 77] ; *Thurman* v. *Ice Palace,* 36 Cal.App.2d 364 [97 P.2d 999].) In baseball, a sport often referred to as our 'national pastime,' it has been held that the spectator as a matter of law assumes the risk of being hit by a fly ball. (*Quinn* v. *Recreation Park Assn.,* 3 Cal.2d 725 [46 P.2d 144] ; *Brown* v. *San Francisco Ball Club, Inc.,* 99 Cal.App.2d 484 [222 P.2d 19].) But when a spectator is hit by a flying baseball bat the doctrine of assumption of the risk is not applied. (*Ratcliff* v. *San Diego Baseball Club,* 27 Cal.App.2d 733 [81 P.2d 625].) The difference in the treatment of these two baseball spectators is explained by the fact that it is a matter of 'common knowledge' that fly balls are a common, frequent, and expected occurrence in this well-known sport, and it is not a matter of 'common knowledge' that flying baseball bats are common, frequent, or expected. It is normal operation of the game for baseball players to try to knock the ball into the bleacher stands, but not to throw the bat into the stands. Likewise, no one at a sports car race would expect that a driver would drive his car off the track and into the spectators as a normal operation of the sporting event.

''Sports car racing can hardly be said to compare with the universal popularity of baseball. The risk of being hit by a fly ball is indeed a common, expected, and frequent occurrence in every baseball game. The risk of being killed or injured by a racing sports car is neither so common, frequent, nor expected an occurrence that it should be considered a matter of 'common knowledge' sufficient to impose 'actual knowledge' on the paying spectator who is standing in an approved spectator area.

"In this case there is much evidence that appellant did not have actual knowledge. On this matter of assumption of risk we cannot say that reasonable minds could not differ on this point (as was said in *Morton, supra*) and that it would be error to submit it to a jury. The *Morton* case is factually distinguishable, as previously shown. The knowledge of Morton was much greater than appellant here, and it must be remembered that the *Morton* case did not hold that Morton had assumed the risk as a matter of law.

"For the above reasons the question of assumption of the risk should have gone to the jury." (213 Cal.App.2d at pp. 193-194.) The case demonstrates the wisdom of the trial court in this case in referring the question of plaintiff's knowledge of the risk to the jury.

An examination of the cases which are reviewed in *Goade* reflects that the court in *Thurman* v. *Ice Palace* (1939) 36 Cal.App.2d 364 [97 P.2d 999], in reversing a verdict directed against the plaintiff, held that a spectator at an ice hockey game, who voluntarily selected a seat which was not protected by a screen, on the edge of the rink, did not, as a matter of law, assume the risk of being struck by a puck used in the game, and that the question of whether the defendants (other than the players, as to whom a directed verdict was upheld) were negligent in not providing either warnings or protection was a question of fact for the jury. (36 Cal.App.2d at pp. 366-367.) The court distinguished the baseball spectator cases because of the difference in the state of common knowledge as to the risks of the respective games (*id.*, p. 368). In *Shurman* v. *Fresno Ice Rink, Inc.* (1949) 91 Cal.App.2d 469 [205 P.2d 77], the court followed *Thurman* and rejected an appeal to overrule it because the state of common knowledge of the risks of ice hockey had changed. (91 Cal.App.2d at pp. 474 and 477.) Although the case mentions assumption of risk and rejects the contention that the plaintiff had assumed the risk of the flying puck as a matter of law (*id.*, pp. 474-476), the only factual question raised was that in relation to the defendant's duty to take precautions for the spectators (*id.*, pp. 476-477). The case was reversed for errors in the exclusion of evidence on this issue (*id.*, p. 477).

In the baseball spectator cases recovery for injury resulting from being struck by a batted or thrown ball generally has been denied as a matter of law. In *Quinn* it was held fallacious to assert that the act of a baseball player in batting a foul ball which falls among the spectators in the grandstand is itself

negligence. A directed verdict for the defendant player was affirmed on motion. (3 Cal.2d at pp. 729-731.) The duty of the management was defined as limited to providing screened seats for as many as may be reasonably expected to call for them on any ordinary occasion (*id.*, p. 729), and the opinion adopted by the Supreme Court recites: "it is common knowledge that in baseball games hard balls are thrown and batted with such great swiftness they are liable to be thrown or batted outside the lines of the diamond, and spectators occupying positions which may be reached by such balls assume the risk of injury therefrom." (*Id.*, p. 730.) It concluded: "Under the law as declared in the cases above cited, therefore, it would seem clear that in accepting the unscreened seat, even temporarily, with full knowledge of the danger attached to so doing, she assumed the risk of injury, which precluded recovery of damages." (*Id.*, p. 731.) The opinion then continues to discuss the issue as though it were one of contributory negligence, and concludes that on the facts there was no abuse of discretion in refusing to submit that issue to the jury and a directed verdict for the defendant was affirmed (*id.*, p. 732). The opinion defies analysis as to whether the spectator was barred from recovery because of lack of negligence of the management, or because of assumption of the risk of some negligence by the victim. In *Brown* v. *San Francisco Ball Club, Inc.* (1950) 99 Cal.App.2d 484 [222 P.2d 19] the court affirmed a directed verdict for the defendant management on facts similar to *Quinn* where the patron apparently was struck by a thrown ball. The court postured the case in the relationship of invitor and invitee and the respective factors of the former's duty to protect the latter, and the latter's duty to protect himself. (99 Cal.App.2d at pp. 486-487.) The court stated: "In baseball, one of these factors is that the patron participates in the sport as a spectator and in so doing subjects himself to certain risks necessarily and usually incident to and inherent in the game; risks that are obvious and should be observed in the exercise of reasonable care. This does not mean that he assumes the risk of being injured by the proprietor's negligence but that by voluntarily entering into the sport as a spectator he knowingly accepts the reasonable risks and hazards inherent in and incident to the game." (*Id.*, p. 487.) It then followed the rule of *Quinn* in relation to the responsibility of the management to furnish screened seats (*id.*, pp. 487-488). The court reviewed plaintiff's contention that her ignorance of the game of baseball and attendant risks

took her case out of the general rule (*id.*, pp. 488-492), and, as buttressed by other authorities, concluded: "We find nothing here to take appellant outside the usual rule, whether it be said that this 'common knowledge' of these obvious and inherent risks are imputed to her or that they are obvious risks which should have been observed by her in the exercise of ordinary care." (*Id.* p. 489.) The opinion makes it clear that the sole issue considered was the negligence of the defendant when it states: "We conclude that the evidence herein, viewing it most favorably to the appellant, does not take her outside the application of the rule announced in the *Quinn* case; that she assume the risk of injury in respect to which she complains; that the injury was not caused by any negligence upon the part of the respondent; and that determination thereof was a proper function of the trial court upon motion for directed verdict.

"In the absence of negligence upon the part of the respondent, it is unnecessary to consider the question of contributory negligence upon the part of the appellant." (*Id.*, p. 492.)

In *Ratcliff* v. *San Diego Baseball Club* (1938) 27 Cal.App. 2d 733 [81 P.2d 625], the court recognized the rule of the responsibility of the management to furnish but a limited amount of seats screened against the hazard of batted and thrown balls as expounded in *Quinn*. (27 Cal.App.2d at pp. 735-736.) There was, however, no issue of assumption of risk. The defendant management conceded that patrons should be furnished protection from flying bats in the area where the greatest danger existed and where such an occurrence was reasonably to be expected. The sole question was whether it was reasonable to anticipate that there was such a danger in the unprotected aisle or passageway where plaintiff was in fact struck. The court concluded: "It was a question for the jury whether such an accident as this could have been reasonably anticipated and we think the evidence is sufficient to sustain their finding upon that question." (*Id.*, p. 738.) Nowhere in the opinion does one find the explanation suggested in *Goade*. In fact, the evidence in the case is to the effect that "bats rather frequently slip from the hands of batters and that such occurrences are not unusual, although they may not occur in every game . . . [and] that occasionally such bats fly into the grandstand . . . ." (*Id.*, p. 738.) The point of the case is that the management has a duty "reasonably to protect that part of the grandstand behind and near home plate, where the greatest danger from flying balls exists" (*id.*, p. 736) and also the area where there is a risk of flying bats.

In *Mann* v. *Nutrilite, Inc.* (1955) 136Cal.App.2d 729 [289 P.2d 282], the plaintiff appealed from a judgment of nonsuit in which she sought to recover damages from the sponsors of the team for the alleged negligence of a player who threw a ball which struck her. The plaintiff was the chaperon for a girls' softball team and was on the field during a "warm-up" period before the game when she was struck by a ball which the player was attempting to throw back to a batter who was batting balls to the outfielders. The plaintiff sought to distinguish the rule of *Quinn, supra,* and *Brown, supra,* because a player and not the management was involved, and because she had no actual knowledge that the throw would be low, rather than thrown on an arc well overhead. She proposed the application of the following rule: "a distinction is to be made between the intent and the result; that in any game a certain margin of error is expected; that it is expected that the intent of the player will be to attempt to perform his feat without creating an unreasonable risk to others; that if the intent is proper the error will not be one of negligence, but if the intent is one which may be considered an improper exercise of care and reckless disregard of the safety of others, the error amounts to negligence . . . ." (136 Cal.App.2d at p. 733.) The court stated: "The general rule is well established that the risk of being struck by batted or thrown balls is one of the natural risks assumed by spectators attending a ball game, in the absence of a sufficient showing that ordinary care was not exercised by the management. The rules established in that connection should be much more applicable where the injured person goes on the field of play and is, in effect, in the position of a participant. The appellant here assumed such a position with full knowledge of the natural and inherent risks involved." (*Id.,* p. 734.) The court then analyzed the evidence and concluded: "Miss Baker returned the ball, as the appellant knew she was expected to do, and the evidence indicates merely that an unintentional error occurred, the sort of mistake which naturally and frequently occurs in any ball game or warm-up." (*Id.,* p. 735.) In affirming the nonsuit the case appears to determine that there was no negligence on the part of the player, but contains the enigmatic statement: "In view of the only evidence in the record with respect to negligence, the court was justified in finding that the appellant assumed the risk naturally involved in taking her position on this field of play." (*Id.,* p. 735.)

The foregoing cases suggest that in cases of participation in

activities in which there are common hazards to the participants, as distinguished from cases where one places himself within the sphere of the hazard created by another, the true approach is to determine whether there has been a consent to the invasion of rights which subsequently occurs. It is stated as has been noted, that assumption of risk is a factor in the spectator or participant cases, and the doctrine has been suggested as applicable, as it was thought to be in this case. (See *Goade v. Benevolent etc. Order of Elks, supra,* 213 Cal.App.2d 189, 192-194; *Morton v. California Sports Car Club, supra,* 163 Cal.App.2d 685, 687-690; *Mann v. Nutrilite, Inc., supra,* 136 Cal.App.2d 729, 734.) Prosser states the rule as follows: "Implied assumption of risk has been found in a variety of cases, in some of which the plaintiff's conduct has apparently been quite reasonable, while in others it has amounted to contributory negligence. By entering freely and voluntarily into any relation or situation which presents obvious danger, the plaintiff may be taken to accept it, and to undertake to look out for himself and relieve the defendant of responsibility. Thus those who participate or sit as spectators at sports and amusements may be taken to assume all the known risks of being hurt by roller coasters, flying baseballs, golf balls, or wrestlers, or such things as fireworks explosions. Cardozo once summarized all this quite neatly: 'The timorous may stay at home.'" (Prosser, *op. cit.,* pp .459-460; and see Rest.2d Torts, §§ 496A-496G, particularly § 496A, com. c, 2, and § 496C, com. b and illus. 1, 2, 4 and 5 following com. g.)

Contrapuntally a kinship exists with doctrines expressly dealing with consent as affecting the existence of a right of action for intentional invasions of one's rights. Immediately following the first of the above quotations from Prosser (p. 14, *supra*), that author states: "In its simplest and primary sense, assumption of risk means that the plaintiff, in advance, has expressly given his consent to relieve the defendant of an obligation of conduct toward him, and to take his chances of injury from a known risk arising from what the defendant is to do or to leave undone. The situation is then the same as where the plaintiff consents to the infliction of what would otherwise be an intentional tort, except that the consent is to run the risk of unintended injury, to take a chance, rather than a matter of the greater certainty of intended harm. The result is that the defendant is relieved of all legal duty to the plaintiff; and being under no duty, he cannot be charged with negligence." (Prosser, *op. cit.,* p. 450; and see Fleming, *Assump-*

*tion of Risk* (1952) 61 Yale L.J. 141.) Reference to the subject of consent reflects the following: ''The consent of the person damaged will ordinarily avoid liability for intentional interference with person or property. It is not, strictly speaking, a privilege, or even a defense, but goes to negative the existence of any tort in the first instance. It is a fundamental principle of the common law that *volenti non fit injuria*—to one who is willing, no wrong is done. The attitude of the courts has not, in general, been one of paternalism. Where no public interest is contravened, they have left the individual to work out his own destiny, and are not concerned with protecting him from his own folly in permitting others to do him harm. In the field of negligence, this policy has been given effect by the doctrine of assumption of risk, which relieves the defendant of the obligation to exercise care. As to intentional invasions of the plaintiff's interests, his consent negatives the wrongful element of the defendant's act, and prevents the existence of a tort. 'The absence of lawful consent,' said Mr. Justice Holmes, 'is part of the definition of an assault.' The same is true of false imprisonment, conversion, and trespass.'' (Prosser, *op. cit.*, p. 102; and see Rest.2d Torts, § 50, com. b and illus. 4, 5 and 6.) ''One who enters into a sport, game or contest may be taken to consent to physical contacts, consistent with the understood rules of the game.'' (Prosser, *op. cit.*, p. 103; and in addition to the authorities cited by the author see *Gaspard* v. *Grain Dealers Mutual Ins. Co.* (La.App. 1961) 131 So.2d 831, 834 (flying bat); *McLeod Store* v. *Vinson* (1926) 213 Ky. 667 [281 S.W. 799] (scramble for guinea hens released in store contest); *Thomas* v. *Barlow* (1927) 5 N.J.Misc. 764 [138 A. 208] (blow on jaw in basketball game); *McGee* v. *Board of Education of the City of New York* (1962) 16 App. Div.2d 99 [226 N.Y.Supp.2d 329] (assistant coach hit by thrown ball); and cases collected Annotation (1949) 7 A.L.R.2d 704, 714-718.) ''The consent is to the plaintiff's conduct, rather than to its consequences. If the plaintiff willingly engages in a boxing match, he does not of course consent to be killed, but he does consent to the defendant's striking at him, and hitting him if he can; and if death unexpectedly results, his consent to the act will defeat any action for the resulting invasion of his interests. He does not, on the other hand, consent to being hit with brass knuckles, which is the same invasion by an act of a different character.

''The defendant's privilege is limited to the conduct to which the plaintiff consents, or at least to acts of a substan-

tially similar nature. A consent to a fight with fists is not a consent to an act of a different nature, such as biting off a finger, or stabbing with a knife. Permission to dump 'a few stones' upon property is not a permission to cover it with boulders. If the defendant goes beyond the consent given, and does a substantially different act, he is liable.'' (*Id.*, pp. 104-105.) In the same vein it has been said: ''Generally, the participants in an athletic event are held to have assumed the risks of injury normally associated with the sport [citations]. Players, coaches, managers, referees and others who, in one way or another, voluntarily participate must accept the risks to which their roles expose them. Of course, this is not to say that actionable negligence can never be committed on a playing field. Considering the skill of the players, the rules and nature of the particular game, and risks which normally attend it, a participant's conduct may amount to such careless disregard for the safety of others as to create risks not fairly assumed. But it is nevertheless true that what the scorekeeper may record as an 'error' is not the equivalent, in law of negligence.'' (*McGee* v. *Board of Education of the City of New York, supra,* 16 App.Div.2d 99, 101-102, 226 N.Y.Supp.2d 329, 331-332.)

The foregoing rules appear more appropriate to participation in sports than concepts of negligence and assumption of risk which have been referred to in this and other cases. This route, however, leads to the same result. ▪▪▪ There is a dispute as to the scope of the implied consent conferred by participation in the express type of softball game that was being played, or, from the other side of the coin, a dispute as to whether defendant's conduct exceeded the scope of the consent to be implied from such participation. This matter cannot be settled as a matter of law on the evidence in this case, and was properly left to the jury.

The parties framed the issues in terms of negligence and assumption of risk and the trial court cannot be criticized for submitting the matter to the jury in those terms. In fact, if the statement '' 'The absence of lawful consent . . . is part of the definition of assault' '', (*supra*) and a concomitant duty on the plaintiff to prove the absence of such consent are compared with the doctrine of assumption of risk and an attendant duty on the defendant to prove it as a defense, the plaintiff is benefited by a shift in the burden of proof when the case is posited in the latter setting. (See Prosser, *op. cit.*, pp. 453-454; *Klinsky* v. *Hanson Van Winkle Munning Co.* (1955) 38

N.J. Super. 439, 444 [119 A.2d 166, 168] (cert. den. 20 N.J. 534, 120 A.2d 661) ; and cf. Fleming, *op. cit.*, 61 Yale L.J. at p. 169.)

The question of whether plaintiff was one who "knows that a danger exists in the conduct of another during the ordinary course of a game or activity" was left to the jurors. They were correctly told that the act of defendant would have to be "without intention." They were properly advised to consider not only plaintiff's "actual knowledge of the danger involved," but also his "appreciation of the magnitude of that danger." (See *Shahinian* v. *McCormick, supra*, 59 Cal.2d 554, 566-567.)

Under these instructions plaintiff was free to argue, as he has before this court, that under the circumstances there was no warrant in finding that this was the type of game in which a participant could be expected to slide, or, if it were, that defendant's slide was of a type that exposed plaintiff to a risk of a magnitude which he could not have anticipated. Defendant was equally free to argue and the jury could properly find, as it did, that there was nothing in the circumstances to convey to a knowledgeable player that another participant would not slide if the occasion arose, and that the accident and resulting injury were an unfortunate and unintended consequence of the normal pursuit of the game.

The judgment is affirmed.

Sullivan, P. J., and Molinari, J., concurred.